IN THE COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

February 22, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

E1998-00855-COA-R3-CV

DONALD JAMES ALEXANDER,       ) C/A NO. 03A01-9812-CV-00401
                              )
         Plaintiff-Appellee,  )
                              )
                              )
                              )
v.                            ) APPEAL AS OF RIGHT FROM THE
                              ) HAMILTON COUNTY CIRCUIT COURT
                              )
                              )
                              )
                              )
CAROLYN PAXTON ALEXANDER,     )
                              ) HONORABLE W. NEIL THOMAS, III,
         Defendant-Appellant.) JUDGE


For Appellant                  For Appellee

GLENNA M. RAMER                PHILLIP C. LAWRENCE
Chattanooga, Tennessee         Lawrence, Lawrence & Gerbitz, PLLC
                               Chattanooga, Tennessee


O P I N I O N


REVERSED AND REMANDED                          Susano, J.

1

This is a post-divorce case that presents numerous and difficult questions relating to the interpretation and application of the Child Support Guidelines ("Guidelines") promulgated by the Department of Human Services, Child Support Services Division, pursuant to the authority of T.C.A. § 36-5-101(e)(2). The original defendant, Carolyn Paxton Morrow ("Mother") -- formerly Alexander -- filed a petition on September 4, 1997, seeking an increase in the general child support obligation of her former husband, Donald James Alexander ("Father"). Following a hearing on August 18, 1998, the trial court filed its "Memorandum and Order" in which it held that Mother had not demonstrated that there had been a "significant variance" as defined in the Guidelines to warrant an increase in child support. Accordingly, it denied Mother's petition. She appeals, raising three issues:

> 1. Does the evidence preponderate against the trial court's finding of no significant variance between the amount of child support being paid by Father and the amount of child support that would be due under the Guidelines as applied to Father's current income level?
>
> 2. Did the trial court err when it failed to consider the lifestyle of Father in determining matters of income?
>
> 3. Is Mother entitled to her attorney's fees incurred at the trial level and on appeal?

I. *Background*

The parties' marriage was dissolved by judgment entered February 22, 1995. That judgment ended a marriage of approximately twelve and a half years; it incorporated the parties' marital dissolution agreement ("MDA"), pursuant to which Mother was awarded custody of the parties' minor children, Justin

2

Travis Alexander (DOB: June 27, 1984) and Liesl Michele Alexander (DOB:  August 28, 1985).  By agreement of the parties, Father was ordered to pay child support of $2,194 per month.

As pertinent here, the MDA, signed by the parties in February, 1995, provides that Mother had already received, or would shortly receive, alimony awards as follows:

> 1. $205,000 alimony *in solido* to be used by Mother to purchase a residence in Ooltewah, Tennessee.  According to the MDA, this obligation had already been satisfied.
>
> 2. $136,000 alimony *in solido* to be used by Mother as operating capital for two businesses.  This was to be paid by Father "within five (5) days of approval of the final divorce decree."
>
> 3. $60,000 "as a lump sum alimony *in futuro* payment effective five (5) days after the final decree of divorce is executed by the Court."

Mother, who was not represented in the divorce proceedings, also received all of the parties' interest in one of the parties' businesses -- Liesl's Garden, Florist and Gift Shop -- and all but 5% of the parties' interest in the other business, a restaurant known as Cirrus Garden Cafe.  The MDA awarded Father the remaining 5% interest in the restaurant.  Father was also awarded the marital residence located on 340 acres in Harrison, Tennessee.  According to Mother, the residence had been built in the 1987-1988 time frame at a cost of "in excess of a million dollars."  The MDA contains other provisions that are not directly relevant to the issues on this appeal.

On June 15, 1995, Mother remarried.  In August, 1996, she and her husband, along with her children, moved to

3

California.  Following the move, Mother and her husband both enrolled in college.  Neither was working at the time of the hearing below, but each was receiving a small stipend from the State of California for educational and living expenses.  When Mother moved to California, she sold her house in Ooltewah and closed the businesses that she had received in the divorce.  She bought a new residence in California.

II.  *Operative Facts*

At the hearing below, Mother contended that there had been a "significant variance" between the amount of child support being paid by Father and the amount of child support calculated pursuant to the Guidelines based upon Father's current level of income.  She relied primarily upon Father's lifestyle and his federal income tax returns to substantiate her position.  As pertinent here, those tax returns reflect the following:

|                          | 1995       | 1996       | 1997       |
|--------------------------|-----------|-----------|-----------|
| Wages                    | --         | --         | $114,423   |
| Interest Income          | $  9,891   | $ 10,943   | 2,604      |
| Dividends                | 51,765     | 45,065     | 61,277     |
| Business Income <Loss>   | <102,076>  | <89,102>   | <103,195>  |
| Capital Gains            | 974,442    | 454,057    | 8,354      |
| Other Income             | 16,067     | 24,983     | 23,149     |
| Adjusted Gross Income    | $950,089   | $445,946   | $106,612   |
| Taxable Income           | $678,410   | $310,594   | $ 58,039   |
| Federal Income Tax       | $186,927   | $ 83,801   | $ 12,641   |

Father is one of 11 grandchildren of O.D. McKee, the founder of McKee Baking Company, which is now McKee Foods Corporation ("McKee").  The company is probably best known for its product, Little Debbie Snack Cakes.  It is headquartered in Collegedale, Tennessee.

4

Following his graduation from college in 1982 and a short stint as a computer salesman, Father worked for McKee from 1983 to 1993. After leaving the company in January, 1993, he was involved in a number of ventures and self-employment, all of which he pursued without much financial success. In 1997, Father was installed as president of Sanda Hosiery Mills ("Sanda"), a subsidiary of Redwood Annex, a company owned by his parents. Sanda had been doing poorly before Father became involved and it continued to decline under his presidency. On May 31, 1997, it ceased production of its line of baby socks and commenced the closing down of all operations. Father continued receiving compensation from Sanda while the company wound up its affairs. His final paycheck from Sanda was due around the time of the modification hearing, *i.e.*, August 18, 1998. He testified at the hearing that he was looking for new employment.

Father travels extensively. He has taken his children on many of his trips, both in the United States and abroad. At the time of the hearing below he owned a sailboat that he was offering for sale for $360,000. He also owned a motor home for which he had paid some $160,000. He was also the owner of between 53,000 and 56,000 shares of McKee common stock. An appraisal done in 1997 at the request of the company indicated that the stock was then worth $71 per share.

### III. *Standard of Review*

In this non-jury case, our review is *de novo* upon the record with a presumption of correctness as to the trial court's factual findings, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; **Wright v. City of Knoxville**,

5

898 S.W.2d 177, 181 (Tenn. 1995).  The trial court's conclusions
of law, however, are not accorded the same deference.  **Campbell
v. Florida Steel Corp.**, 919 S.W.2d 26, 35 (Tenn. 1996); **Presley
v. Bennett**, 860 S.W.2d 857, 859 (Tenn. 1993).


IV.  *Significant Variance*


The pleadings and proof in this case bring into play
T.C.A. § 36-5-101(a)(1), which reads, in pertinent part, as
follows:


> In cases involving child support, upon
> application of either party, the court shall
> decree an increase or decrease of such
> allowance [of child support] when there is
> found to be a *significant variance*, as
> defined in the child support guidelines
> established by subsection (e), between the
> guidelines and the amount of support
> currently ordered....


**Id**.  (Emphasis added).  A "significant variance," as pertinent
here, is defined and addressed in the Guidelines as follows:


> For the purposes of defining a significant
> variance between the guideline amount and the
> current support order pursuant to T.C.A. §
> 36-5-101, a significant variance shall be at
> least 15% if the current support is one
> hundred dollars ($100.00) or greater per
> month....Such variance would justify the
> modification of a child support order....Upon
> a petition for adjustment by either party,
> the court shall increase or decrease the
> award amount as appropriate in accordance
> with these guidelines....


Tenn.Comp.R. & Regs., ch. 1240-2-4-.02(3).  The trial court found
that there had not been a significant variance and denied
Mother's petition.  In order to evaluate the correctness of the
trial court's judgment, we must analyze the income earned by

6

Father since the divorce judgment was entered on February 22, 1995.

V. *Father's Gross Income*

The record before us contains Father's federal income tax returns for 1994, 1995, 1996, and 1997. In addition, we have testimony with respect to his gross income in 1998. Father contends that we cannot consider income earned prior to September 4, 1997, the date on which Mother filed her petition for modification. He argues that consideration of pre-September 4, 1997, income would violate the following provision of T.C.A. § 36-5-101(a)(5):

> [A] judgment [for child support] shall not be
> subject to modification as to any time period
> or any amounts due prior to the date that an
> action for modification is filed and notice
> of the action has been mailed to the last
> known address of the opposing parties.

*Id*. This statutory provision is designed to prohibit the retroactive modification of child support. **Rutledge v. Barrett**, 802 S.W.2d 604, 606 (Tenn. 1991). In other words, a court has no power to alter a child support award as to any period of time occurring prior to the date on which an obligee spouse files his or her petition. However, the subject statute does not prevent a court from factoring into the new-income side of the equation, pre-filing income earned by an obligor if, in the court's discretion, the inclusion of such income is appropriate in order to accurately calculate an obligor's new income level.

The Guidelines recognize that a court, in some cases, will have to average an obligor's income in order to eventually

7

determine the net income upon which the percentages set forth in Tenn.Comp.R. & Regs., ch. 1240-2-4-.03(5) should be applied. In this case, we believe it is appropriate to average Father's income for the years 1995-1998 in order to determine if there has been a "significant variance." Since these parties were divorced relatively early in 1995, we believe it is permissible and appropriate to consider Father's income in that year. In this case, given the sources of Father's income, there is no reason to believe that his 1995 income was a significant factor in the parties' agreement regarding support.

As previously indicated, there is testimony in the record regarding Father's income in 1998. That testimony indicates that his 1998 gross income for purposes of the Guidelines would be as follows:

```
Wages and Director's Fee
   (Sanda and its parent company)    $ 71,000
Dividend Income, McKee                 60,000
Non-McKee Income                        5,500
Other Income from McKee                15,000
Gift from Parents                      20,000

                                     $171,500
```

As to the "gift from parents," the testimony was that for many years Father's parents had given him $20,000 per year in cash or stock, the maximum permissible tax-free gift under the Internal Revenue Code. While such gifts are not taxable and are not considered income under generally accepted accounting principles, they are considered income under the Guidelines. *See* Tenn.Comp.R. & Regs., ch. 1240-2-4-.03(3)(a).

Thus, the record reflects gross income since the parties' divorce in early 1995 as follows:

```
1995                            $950,089
1996                             445,946
1997                             106,612
1998 (projected)                 171,500
```

Before discussing the conversion of Father's gross income to net income under the Guidelines, we must address some sub-issues presented by the facts of this case.

## VI.  *Business Losses*

Father's tax returns reflect business losses for each of the years of 1995 to 1997. The losses in 1996 and 1997 as well as the bulk of the loss in 1995 relate to Father's ownership of a company known as DJA Leasing. The evidence supports the following facts as taken from Father's brief:

> The...heirs of O.D. McKee...[are] given the opportunity of owning the rolling stock, *i.e.*, tractors and trailers and sales vehicles, used by McKee Foods Corporation. Schedule C, "Profit or Loss From Business," of [Father's] federal income tax returns for 1995, 1996 and 1997 reflect business activity of a vehicle leasing business operating under the business name of DJA Leasing. According to...[Father's] accountant, [Father] operates the leasing company as an unincorporated, sole proprietorship. Those vehicles are purchased through a line of credit at Pioneer Bank, and the lease payments from McKee are used to pay the following expenses: interest on the loan, the sales tax on the lease payments, repairs and maintenance, licenses and taxes, and the insurance on the vehicles. From the surplus of the lease payments over the expenses, the principal payments on the line of credit are made. [Father] receives no cash whatever [sic] from the ownership of this leasing company, and the only financial advantage to him is a tax loss that he can claim against his income.

Father's tax returns indicate the following with respect to DJA Leasing:

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| Income less expenses other than depreciation | $189,010 | $310,323 | $539,829 |
| Less: Depreciation | 288,645 | 399,425 | 643,024 |
| Net Loss on Tax Return | <$ 99,635> | <$ 89,102> | <$103,195> |

Mother contends that we should ignore the depreciation deduction and include Father's income before depreciation, in computing Father's average gross income and ultimately his average net income for the period 1995-1998.

The Guidelines provide that depreciation "should not be considered [a] reasonable expense[]" when a court is attempting to ascertain "[i]ncome from self-employment includ[ing] income from business operations and rental properties, etc., less

10

reasonable expenses necessary to produce such income."
Tenn.Comp.R. & Regs., ch. 1240-2-4-.03(3)(a). *See* **Burchfield v.
Nave**, C/A No. 03A01-9308-JV-00271, 1994 WL 13374 at *3-4
(Tenn.Ct.App. E.S., filed January 21, 1994).  The trial court
expressed doubt regarding the logic and fairness of a literal
reading and application of this rule, noting that "[i]n the
operation of a truck line, or any other business for that matter,
depreciation is a very real expense."

Depreciation, as an accounting concept, spreads the
cost of a capital asset over its presumed useful life.  While it
cannot be "considered" a reasonable expense under the Guidelines,
this does not mean that the real cost of a capital asset cannot
be considered in determining income from self-employment.  In our
unreported case of **Kimble v. Kimble**, C/A No. 02A01-9503-CV-00049,
1996 WL 445272 (Tenn.Ct.App. W.S., filed August 8, 1996), we
opined as follows:

> As our own state legislature has not seen fit
> to either expressly exclude or authorize a
> deduction for capital expenditures, we
> believe it within the sound discretion of the
> trial court to determine when and if
> expenditures of this type are "reasonable."

*Id*. at *5.  We agree with our colleagues in the Western Section.

In the instant case, it is clear that expenditures for
rolling stock -- without which there would be no leasing business
and hence no leasing income -- are reasonable expenses.  We agree
with the trial court that deductions for a portion of the
purchase price of the vehicles of DJA Leasing in the three years
under consideration represent a reasonable expense of that
company.

11

By the same token, we also agree with the trial court that the net losses from DJA Leasing should not be utilized to reduce Father's other sources of income in determining his net income under the Guidelines. There is no proof in the record that Father was required to "go into his pocket" to cover these losses. They are paper losses only -- losses that enabled Father to shelter other sources of income from federal income tax. Accordingly, Father's net "losses" from the operation of DJA Leasing cannot be considered in determining his net income to set child support.

VII. *Capital Gains*

Father sold shares of the common stock of McKee in 1995 and 1996. The stock was sold to the General Conference Corporation of Seventh-Day Adventists ("the Conference"). We again refer to Father's brief for an explanation of these sales:

> Ownership of McKee stock is restricted to family members only and must be sold either back to [McKee], to other McKee family members, or to [the Conference]. If sold to [the Conference], "bargain sale" rules apply whereby the stock is discounted to eighty percent of its appraised value, and the difference between the full value and the discounted value is treated as a charitable contribution.

The evidence preponderates in favor of the correctness of these statements.

The figures shown on Father's 1995 and 1996 federal income tax returns reflect his receipt of 80% of the stock's value pursuant to the bargain sale rules. The following is a detailed analysis of these sales:

12

1995

```
01/06/95 sale of 21,930 shares
   of McKee stock valued at
   $1,250,000 for                        $1,000,008
Less: Cost basis (acquired
   01/01/92)                                 25,566

Capital Gain                             $  974,442
```

1996

```
01/02/96 sale of 9,375 shares
   of McKee stock valued at
   $562,500 for                          $  450,000
Less: Cost basis (acquired
   12/31/89)                                    756

Capital Gain                             $  449,244
```

The trial court stated in its memorandum opinion that "[Father] received his McKee Foods stock in 1972 when the other grandchildren of O.D. and Ruth McKee received their stock." Accordingly, the trial court prorated the gains over 23 and 24 years respectively and held that only $42,367 of the 1995 gain and only $18,919 of the 1996 gain[1] should be considered. The evidence preponderates against the trial court's determination that the stock sold in 1995 and 1996 was acquired in 1972.

We start by noting that capital gains are included within the definition of gross income in the Guidelines. Tenn.Comp.R. & Reg., ch. 1240-2-4-.03(3)(a). *See also* **Brooks v. Brooks**, 992 S.W.2d 403, 407 (Tenn. 1999) ("Generally, capital gains are included in the definition of gross income.") Father argues that "there is no indication that the term 'capital gains' [as used in the Guidelines] is analogous to the term used in the Internal Revenue Code." While this correlation is not expressly

---

[1] In making the computation with respect to 1996, the trial court apparently used the total capital gains figure of $454,057 rather than the capital gain of $449,244 on the McKee stock.

13

stated in the Guidelines, we find and hold that it is logical to equate these two concepts.  Speaking rhetorically, if we cannot use the definition of a capital gain adapted by the Internal Revenue Service, to what source should we resort?  Father does not suggest an alternative definition.

While it is true that Father *started* receiving McKee stock in 1972, it is likewise clear from the evidence that this was only the beginning point of his receipt of stock in that company.  In fact, the tax returns clearly reflect that the McKee stock sold in 1995 was acquired on January 1, *1992*, while the stock sold in 1996 was acquired on December 31, *1989*.  Therefore, it is appropriate to prorate the 1995 capital gain over three years and the 1996 capital gain over six years.  We note that proration over the period of time that a stock is held is consistent with earlier decisions of this Court.  *See, e.g., Smith v. Smith*, C/A No. 01A01-9705-CH-00216, 1996 WL 672646 at *3 (Tenn.Ct.App. M.S., filed October 29, 1997).

As a general proposition, Father contends that we should not consider *any* of the capital gains on the McKee stock sales.  He argues that since he has no present intention of selling any more of this stock, it would be inappropriate to consider it in determining his present level of income.  We reject this argument.  The proof indicates that Father's sale of McKee stock to supplement his income has been a part of his life going back many years.  He himself testified that he had sold stock in the past "[a]s needs pressed, once in a while I had to."  This is borne out in the record.  For example, there is proof that he sold McKee stock at some time in the 1990's to purchase a sailboat for approximately $290,000.  He also sold McKee stock to

14

finance the building of a million-dollar home in 1987-1988. There is no reason to exclude these capital gains *in toto*. To do so would be inconsistent with one of "[t]he major goals in the development of [the] guidelines," *see* Tenn.Comp.R. & Regs., ch. 1240-2-4-.02(2):

> To ensure...to the extent that either parent
> enjoys a higher standard of living, the
> child[ren] share[s] in that higher standard.

Tenn.Comp.R. & Regs., Ch. 1240-2-4-.02(2)(e).

Father makes an additional argument as to why the sales of his McKee stock in 1995 and 1996 should be totally ignored. He contends that he sold his McKee stock in 1995 and 1996 in order to satisfy obligations to Mother under the parties' MDA. He relies upon the case of **Hall v. Hall**, C/A No. 03A01-9701-GS-00030, 1997 WL 404258 (Tenn.Ct.App. E.S., filed July 21, 1997) to support his argument that a capital gain resulting from a sale necessitated by a division of property settlement or decree should not be considered for the purpose of calculating child support. While we agree that **Hall** appears to stand for this proposition, we find that the evidence only partially supports Father's contention.

The parties' MDA was finally agreed to on February 22, 1995. It reflects that Mother had already received, prior to that date, some $205,000 as alimony *in solido* in connection with the purchase of her residence in Ooltewah. That house was purchased in October, 1994. Mother testified that she received the money for the house at that time. This unrefuted testimony is not consistent with Father's basic argument to the extent that

15

his argument, by implication, includes a claim that his sales of McKee stock on January 6, 1995, and January 2, 1996, were in some way necessitated by his need for cash to fund the $205,000 obligation to Mother under the MDA. It is more logical to believe that the $205,000 payment to Mother came from a sale of McKee stock by Father on July 1, 1994. That sale occurred shortly before the parties separated on July 18, 1994. The proceeds from that sale amounted to $499,997. The evidence preponderates in favor of a finding that it was the 1994 stock sale -- rather than either the 1995 stock sale or the 1996 stock sale -- that funded the $205,000 payment to Mother.

As to the remaining alimony payments to Mother -- $136,000 and $60,000 -- the timing of the 1995 sale of McKee stock[2] is consistent with a finding that this sale was made, at least in part, to fund Mother's alimony payments that totaled $196,000. Since 97.44% of the 1995 sale of McKee stock was a capital gain, we believe that 97.44% of the alimony payments totalling $196,000 should be excluded from the 1995 capital gain in determining Father's gross income for 1995. We agree with Father that a capital gain resulting from a sale of an asset to fund a division of property in a divorce should not be considered in calculating child support. Such a rule prevents "double-dipping."

Our analysis persuades us that the following is a correct determination of the capital gain from the sale of McKee stock in 1995 that should be considered as part of Father's gross income:

---

[2]The stock was sold on January 6, 1995, shortly before the divorce on February 22, 1995.

16

1995

| | |
|---|---|
| Capital gain from sale of McKee stock | $974,442 |
| Less: Portion of gain applicable to $196,000 paid to Mother (97.44% of $196,000) | 190,982 |
| Capital gain excluding portion applicable to payments to Mother | $783,460 |

As previously indicated, we believe the 1995 capital gain should be prorated over three years, the period of time during which Father owned the stock that he sold in 1995. Hence, one-third of $783,460, or $261,153 should be treated as his capital gain from the sale of McKee stock for the year 1995.

There is no credible evidence that any portion of the 1996 capital gain on the sale of the McKee stock was related to the parties' divorce settlement. It results that the full gain of $449,244 is spread over the six years that the stock was owned by Father. The per-year allocation of the gain is $74,874, *i.e.*, $449,244 divided by six years. It results that $74,874 is allocated to each of the years of 1995 and 1996.

VIII. <em>Conclusion</em>

A.

We find and hold that the evidence preponderates in favor of the following findings with respect to Father's gross income for the years 1995-1998 pursuant to the definitions and directives of the Guidelines:

| | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|
| Salary from Employment | | | | |

17

| | | | | |
|---|---|---|---|---|
| and Director's Fees | -- | -- | $114,423 | $ 71,000 |
| Interest Income | $ 9,891 | $ 10,943 | 2,604 | -- |
| Dividends from McKee | 51,639 | 42,213 | 59,451 | 60,000 |
| Non-McKee Dividends | 126 | 2,852 | 1,826 | 5,500 |
| Capital Gains | | | | |
| --McKee Stock | | | | |
| --1995 Sale | 261,153 | | | |
| --1996 Sale | 74,874 | 74,874 | | |
| Capital Gains--Other | -- | 4,813 | 8,354 | -- |
| Other Income | | | | |
| --McKee | 20,375 | 24,983 | 23,149 | 15,000 |
| --Others | <4,308> | -- | -- | -- |
| Gift from Parents | 20,000 | 20,000 | 20,000 | 20,000 |
| | $433,750 | $180,678 | $229,807 | $171,500 |

Over the four-year period, Father's average gross income per year was $253,934. While child support under the Guidelines is based on net income rather than gross income, Father's average annual gross income during the period under review is sufficiently large enough to clearly indicate that the evidence preponderates against the trial court's determination that Mother failed to prove a significant variance "between the guidelines and the amount of support currently ordered." T.C.A. § 36-5-101(a)(1). Since Father's current child support obligation of $2,194 per month was based on a net income of $6,856.75 per month[3] -- which extrapolates to a monthly gross of $9,900 under the Guidelines in effect at the time of the divorce -- and since Father's average gross income over the four years under discussion is substantially in excess of $118,800 ($9,900 per month x 12 months), it is clear that "[a] modification must be made" of the existing support obligation. *See* ***Turner v. Turner***, 919 S.W.2d 340, 344 (Tenn.Ct.App. 1995).

B.

---

[3]This is based on the chart dated July 8, 1994, issued in connection with the Guidelines in effect at the time of the divorce.

This Court has labored long and hard to convert Father's gross income to net income in order to determine the new amount of support due under the Guidelines; we have been unsuccessful in this endeavor. We have finally concluded that the record before us is not complete enough to make the necessary calculations. For this reason, we find it necessary to remand this case to the trial court for further proceedings in connection with Mother's petition to modify.

We would make some instructive comments to guide the trial court in the task that lies ahead.

We find and hold that the trial court erred in approaching this case as if it were one dealing with self-employment income. There is no self-employment *income* at issue in this litigation. Therefore, the trial court was not correct in using the approach to self-employment income found at Tenn.Comp.R. & Regs., ch. 1240-2-4-.03(4). It should be noted that Father's self-employment, DJA Leasing, resulted in net losses rather than net income. None of the income earned by Father from 1995 through 1997 was treated as self-employment income on his tax returns. This can be seen from the fact that his Form 1040 for each of the years of 1995, 1996, and 1997 does not reflect any self-employment tax. *See* line 47 on Father's 1995 and 1997 tax returns and line 45 on his 1996 tax return.

The Guidelines permit only limited tax deductions from gross income in arriving at net income for the purpose of calculating child support. The Guidelines are relatively easy to apply with respect to wages from employment and income from self-employment. Unfortunately, the Guidelines do not expressly

19

provide a mechanism for converting gross income from non-employment sources, such as the ones in this case, into net income. However, the approach taken by the Guidelines in connection with employment-related income suggests that the gross income-to-net income conversion of Father's non-employment gross income should be accomplished by reducing his gross income by an appropriate amount of withholding tax[4] and, where applicable, payroll taxes as opposed to a reduction based on actual taxes ultimately paid on such income. This is because the tax due upon the filing of the return is impacted by many things -- *e.g.*, deductions, tax credits, and other considerations -- that have nothing to do with the concept of net income envisioned by the Guidelines.

The gross income in this case for the purposes of the guidelines can be broken down into four categories:

1. Salary from employment and the director's fee from Redwood Annex

2. Interest income, dividends, other income

3. Capital gains[5]

4. Gifts from parents

The net income from the first category can be computed pursuant to the provisions of Tenn.Comp.R. & Regs., ch. 1240-2-4-.03(4). Withholding tax on the gross income in the second and third categories can be computed from the Internal Revenue Service's Circular E, Employer's Tax Guide and/or other relevant IRS

---

[4]The Court recognizes that taxes are not generally withheld on non-employment income; but it is necessary in this case to make a withholding tax computation in order to establish child support under the Guidelines.

[5]Generally speaking, capital gains in the years 1995-1997 were subject to a maximum tax of 28%. The Court is not aware of how, if at all, this affects withholding taxes on these capital gains.

material for each of the pertinent years.  The fourth category --
not being subject to tax -- can be transferred directly to the
net income line.

In its discretion, the trial court may want to consider
the appointment of a special master[6] -- possibly someone well-
versed in the tax field -- whose task it will be to determine how
to convert Father's gross income to net income under the
Guidelines.  Once the trial court has determined Father's average
net income for the period 1995-1998 based upon the gross income
figures found by this Court in Section VIII(A) of this opinion,
it will then proceed to determine the amount of child support due
under the Guidelines.  In this case, we find and hold that any
child support due Mother based upon the trial court's
determinations and calculations should be effective back to
September 4, 1997, the date on which Mother filed her petition
for modification.

C.

Mother argues in her brief that the trial court erred
in failing to consider Father's opulent lifestyle.  She
apparently relies upon Tenn.Comp.R. & Regs., ch. 1240-2-4-
.04(1)(f), which provides as follows:

> Valuable assets and resources (expensive home
> or automobile which seem inappropriate for
> the income claimed by the obligor) of the
> obligor should be considered for the purpose
> of imputing income and increasing the support
> award in any case if the court finds that
> equity requires it.

---

[6]The court emphasizes that this is a suggestion only.

21

That provision is not implicated by the facts of this case. Father's lifestyle is not inconsistent with his income, when viewed in the context of his net worth and station in life. This is not a case where a court is required to impute income to an obligor. There is no secret wealth in this case. Father's wealth is very evident. He lives the way he does because he is relatively wealthy and can afford to live that way. We agree with the trial court that his lifestyle has absolutely nothing to do with the setting of child support in this case.

### D.

Finally, Mother argues that she is entitled to recover fees and expenses against Father for her counsel's trial and appellate work. We agree. *See* T.C.A. § 36-5-103(c)(Supp. 1999). On remand, the trial court will award Mother her reasonable fees and expenses incurred at the trial level and on appeal.

### E.

The judgment of the trial court is reversed and this cause is remanded to the court below for further proceedings consistent with this opinion. Costs on appeal are taxed to the appellee.

_____
Charles D. Susano, Jr., J.

CONCUR:


_____
Houston M. Goddard, P.J.


_____
William H. Inman, Sr.J.