IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 1, 2003 Session

## EVELYN MARIE ABERCROMBIE v. STEPHEN EUGENE ABERCROMBIE

Appeal from the Chancery Court for Hamilton County
No. 95-497     Howell N. Peoples, Chancellor

**FILED MARCH 29, 2004**

No. E2003-01226-COA-R3-CV

Stephen Eugene Abercrombie ("Father"), the custodian of the parties' two minor children, filed a complaint against his former wife, Evelyn Marie Abercrombie[1] ("Mother"), seeking to modify the trial court's January 19, 2000, order awarding him custody. That order had directed that, if Father decided to enroll the children in private school, Mother would pay one-half of the children's tuition and other private school expenses. The same order, however, recited that Mother was not required to pay any general child support to Father. In his post-divorce complaint, Father asked the trial court to set a sum certain to be paid by Mother to Father as general child support under the Child Support Guidelines ("the Guidelines"). The trial court declined to modify its previous order and dismissed Father's complaint "on the ground[] that the guidelines currently do not show any . . . child support due." Father appeals, arguing that Mother should be required to pay a set amount of general child support in addition to her obligation to pay one-half of the children's private school tuition and related expenses. We reverse and remand with instructions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Selma Cash Paty, Chattanooga, Tennessee, for the appellant, Stephen Eugene Abercrombie.

Marvin Berke, Chattanooga, Tennessee, for the appellee, Evelyn Marie Abercrombie.

**OPINION**

---

[1]Mother has remarried. Her married name is "Myers."

I.

The parties were married on October 20, 1982.  Two children were born to their union–Ann Wagner Abercrombie ("Wagner")[2] (DOB: August 8, 1987) and William Reif[3] Abercrombie ("Will") (DOB: March 28, 1991).  On December 4, 1995, the trial court awarded Mother an absolute divorce on the ground of irreconcilable differences and approved the parties' Marital Dissolution Agreement, which gave Mother primary custody of Wagner and Will and granted Father liberal visitation rights.

On April 28, 1999, Father filed a petition seeking primary custody of the parties' children. On October 8, 1999, the trial court awarded temporary custody of the children to Father.  The parties subsequently agreed upon a permanent parenting plan.  Under the plan, Father received primary custody of both children.  Among other things, the plan specified that Mother was not required to pay Father general child support.  On January 19, 2000, the trial court entered an order incorporating the permanent parenting plan and granting Father "permanent" custody of the children.

On March 19, 2002, Father filed a new complaint asking the trial court to modify its previous order so as to require Mother to pay general child support "commensurate with the needs of the parties' children and [Mother's] ability to pay and the statutory guidelines, retroactive to the date of the filing of [the] complaint."

At a hearing on April 23, 2003, Father testified and introduced a number of exhibits, among which were Mother's federal income tax returns for the years 2000, 2001, and 2002[4] and Mother's investment accounts for 2002 and 2003.  Mother and her tax attorney/CPA also testified.  Mother stated that she does not work outside the home; however, her income tax returns and investment portfolio reflect that she has significant income and substantial assets.  The following figures come directly from Mother's tax returns:

|  | 2000 | 2001 | 2002 |
|---|---|---|---|
| Interest Income | $ 4,144 | $ 4,161 | $ 4,218 |
| Dividends | 88,502 | 86,188 | 75,937 |
| Capital Gains/Losses (Net) | 208,744 | <3,000> | <3,000> |
| Other Income | 1,000 | - | - |

[2] For ease of reference, we will refer to the children as did the parties, i.e., "Wagner" and "Will."  No disrespect is intended by the court's informal approach.

[3] The middle name of this child is spelled in the record two ways, *i.e.*, "Reif" and "Rief."  We use "Reif" because this is how the name is spelled in most of the pleadings and orders.

[4] Apparently, Mother's present husband does not have any taxable income.  Thus, while Mr. and Mrs. Myers filed joint tax returns, all of the income on the returns was generated by Mrs. Myers.

Mother's adjusted gross income, taxable income, and income taxes, as taken from her tax returns, are as follows:

|  | 2000 | 2001 | 2002 |
|---|---|---|---|
| Adjusted Gross Income | $302,462 | $87,424 | $77,201 |
| Taxable Income | 280,214 | 56,970 | 50,606 |
| Taxes | 62,091 | 9,323 | 6,801 |

Mother's liquid assets are maintained in investment accounts at a brokerage house. As of April 30, 2002, her accounts totaled $3,861,175.89. As of March 31, 2003, the date of the most recent statements prior to the hearing on April 23, 2003, four of Mother's five investment accounts totaled $3,239,609.13. The fifth account, which is an IRA, had a balance, as of January 31, 2003, of $20,945.25.

Mother's attorney/CPA testified that his firm had prepared Mother's tax returns for a number of years. According to the witness, Mother's net income in 2002 "after considering the nondeductible capital losses, would be approximately [a net loss of $62,000]." He went on to explain that

> [t]he face of the return shows total income of $77,201, but that's deducting only the 3,000-dollar capital loss, which is all you can deduct over and above your capital gains.

> But then on Schedule D, there is an additional 140,000 of capital loss that's nondeductible and carried over to the future tax years deducted then, but that's actually a realized capital loss from the sale of stock.

> \* \* \*

> And so when those two are combined, it's 62,000 loss.

In essence, the witness was expressing what is clearly true *as a matter of tax law*: the nondeductible capital losses could not be used to further reduce Mother's adjusted gross income of $77,201 because those losses exceeded the $3,000 maximum deduction allowed for capital losses, in excess of capital gains, in any one year.

As previously noted, Mother's adjusted gross income for calendar year 2001 was $87,424. Her attorney/CPA testified that her actual income for that year was $14,000. He arrived at the $14,000 figure by explaining that "if you go to Schedule D of the return, you've got 72,000 of nondeductible capital loss. And so when you subtract that from the 87,424, you get about 14,000 of income." Mother's income of $302,462 in 2000, according to the witness, was significantly impacted by a large capital gain.

At the conclusion of a bench trial, the court below made the following ruling:

> The last order that was in this case was 2000. The child support guidelines define gross income as including income from any source earned or unearned, so that includes dividends and interest and so forth that she has. It also includes capital gains. In this case, we have negative capital gains. When you offset that against her income, she's got negative income for 2002. $14,000 net income in 2001. If we follow the guidelines, there's no child support due under the guidelines.

> \* \* \*

> The Court will dismiss this petition to modify on the grounds that the guidelines currently do not show any support, child support due. She's contributing to the McCallie School tuition, certainly that's proper.

On May 13, 2003, the trial court entered an order dismissing Father's complaint.

## II.

In this non-jury case, our review is *de novo* upon the record of the proceedings below, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995.); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are accorded no such presumption. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## III.

Tenn Code Ann. § 36-5-101(a)(1) (2003) provides, in pertinent part, as follows:

> In cases involving child support, upon application of either party, the court shall decree an increase or decrease of such allowance when there is found to be a significant variance, as defined in the child support guidelines established by subsection (e), between the guidelines and the amount of support currently ordered unless the variance has resulted from a previously court-ordered deviation from the guidelines and the circumstances which caused the deviation have not changed.

The pertinent provisions of the Guidelines are found in Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3). That regulation provides, in part, as follows:

> For the purposes of defining a significant variance between the guideline amount and the current support order pursuant to [Tenn. Code Ann.] § 36-5-101, a significant variance shall be . . . at least fifteen dollars ($15.00) if the current support is less than $100.00 per month. Such variance would justify the modification of a child support order . . . . Upon a petition for adjustment by either party, the court shall increase or decrease the award amount as appropriate in accordance with these guidelines unless the significant variance occurs due to a previous decision of the court to deviate from the guidelines and the circumstances which cause the deviation have not changed.

Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3).

IV.

Father advances two issues for our consideration. Taken verbatim from his brief, they are as follows:

> 1. Does the evidence preponderate against the trial court's finding that Mother had no income as defined by the Guidelines and that no child support that would be due under the Guidelines as applied to Mother['s] income?
>
> 2. Should Mother be ordered to pay attorney's fees on the appeal under the provisions of [Tenn. Code Ann. §] 36-5-103(c)?

Mother states her issue thusly:

> Whether the trial court acted within its discretion when it retained the prior support when the circumstances creating the variance had remained and when no significant variance existed between current support and [the] Guideline[s] support.

V.

Father takes the position that the trial court, in 2000, failed to follow the Guidelines in that the court did not "make[] a written or specific finding on the record that the application of the [G]uidelines would be unjust or inappropriate." *See* Tenn. Comp. R. & Regs., ch. 1240-2-4-.01(2). Emphasizing that Mother had – and continues to have – "substantial assets and interest income,"

Father points out that the trial court did not find that Mother *could not* work outside the home or that ordering her to pay child support would be "unjust or inappropriate" under the Guidelines. *See* Tenn. Code Ann. § 36-5-101(e)(1)(A) (2003); Tenn. Comp. R. & Regs., chs. 1240-2-4-.01(3), 1240-2-4-.02(7). He argues that the trial court's findings (1) "that Father had substantial assets and ability to support the children" and (2) that Mother "is currently not working outside the home," as a matter of law, do not justify a deviation from the Guidelines-mandated support and are not sufficient to satisfy the "written or specific finding" requirement of Tenn. Comp. R. & Regs., ch. 1240-2-4-.01(2). Father contends, in the alternative, that a parent may not bargain away a child's right to support.

Father also disputes Mother's claim that her payment of Will's tuition and other private school expenses – apparently some $7,000 plus per year – constitutes child support under the Guidelines. Father contends, under **Barnett v. Barnett**, 27 S.W.3d 904 (Tenn. 2000), that these payments are not general child support, but rather an amount "in addition to [general] child support." Father argues that, under Tenn. Comp. R. & Reg., ch. 1240-2-4-.04(1)(c), Mother's private school payment obligation is an "extraordinary educational expense[]" and should be in addition to an award of general child support.

Father also disputes the trial court's finding with respect to Mother's income in 2002. According to Father, the trial court erroneously found that Mother had a negative income for 2002 because of "capital losses." Father contends that the trial court's calculation of Mother's income was in error because capital losses are not "income" as defined under Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(3). Father also argues that Mother should not benefit from "creating an artificial loss" with respect to her income.

Mother responds to Father's arguments by contending that an increase in child support is not warranted under the facts of this case. Specifically, Mother argues that a significant variance does not exist here because the circumstances that caused the trial court to deviate from the Guidelines have not changed. Mother contends that the trial court was correct when, in 2000, it justified a deviation from the Guidelines based on the fact that Mother was unemployed and the additional fact that Father had significant assets from which to support the children.

Mother also contends that the factual circumstances prompting the trial court's order of January 19, 2000, have not changed because she still does not work and because Father failed to prove "that he no longer has significant assets." In the alternative, Mother argues that she should not be ordered to pay general child support because she had an income of only $14,000 in 2001[5] and a negative income in 2002. Further, Mother argues that the order requiring her to pay private school expenses "in excess of $7,000 per year" essentially "forces [her] to pay approximately $600 per month when she has no income."

---

[5]Mother mistakenly asserts that her income in 2000 was $14,000. It is clear from her 2000 and 2001 tax returns and from the testimony of her attorney/CPA that the claimed $14,000 income occurred in 2001.

## VI.

### A.

The issues raised by the parties, the arguments in the briefs, and the record before us present five questions for our review:

> 1. Did the trial court, in its earlier order of January 19, 2000, deviate from the Guidelines when it decreed that Mother was not obligated to pay general child support to Father?
>
> 2. If there was a deviation, have "the circumstances which caused the deviation . . . changed"?
>
> 3. If the "circumstances . . . have changed," is there a "significant variance" between the child support decreed in the earlier order and the child support that would now be due under the Guidelines?
>
> 4. If general child support is now due, what is the appropriate amount under the Guidelines and when should it be effective?
>
> 5. Is Father entitled to attorney's fees for his counsel's work on appeal pursuant to Tenn. Code Ann. § 36-5-103(c)?

We will explore these questions in the order stated.

### B.

### 1.

In its order of January 19, 2000, the trial court approved the permanent parenting plan jointly submitted by the parties and incorporated it into the order. The order recites that the court "finds [the support provisions in the plan] to be in accordance with the . . . Guidelines." The *order* does not mention a deviation from the Guidelines; however, the incorporated *plan* does state that the court *is deviating* from the Guidelines. The pertinent language in the plan is as follows:

> [I]nasmuch as [Father] currently has substantial assets which are sufficient to provide for the needs of the minor children . . . and in view of the fact that [Mother] is currently[] not working outside the home, that these reasons justify the Court's *deviation* from the Child Support Guidelines such that at this time, [Mother] shall not be required to pay any support and maintenance to [Father] for the support of the parties' minor children.

-7-

(Emphasis added). The plan further provides that "[Mother] shall be responsible for payment of one-half (½) of all tuition, costs, book fees, and all other costs associated with the attendance of either or both children at any private school selected by [Father]."

Mother's 1999 federal income tax return reflects the following:

| | |
|---|---|
| Capital gains | $150,117 |
| Dividends | 75,084 |
| Taxable interest | 3,564 |
| Tax-exempt interest | 3,408 |

In view of these figures, it is reasonable to assume that, had the trial court not deviated from the Guidelines, Mother's general child support obligation would have been relatively significant.

While the trial court's order of January 19, 2000, does not expressly state that the court is deviating from the Guidelines, it is obvious to us from the language of the court-approved permanent parenting plan and the significant level of Mother's 1999 income, that the trial court did in fact deviate[6] from the support that otherwise would have been due under the Guidelines.

Since the trial court deviated from the Guidelines in the order sought to be modified in this case, we must now examine the provisions of the Guidelines implicated by a request to modify a prior court order that was based upon a decision to deviate from the Guidelines.

2.

Under the language of Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3), a trial court can modify an earlier order decreeing a deviation from the Guidelines provided there is a "significant variance,"

> unless the significant variance occurs due to a previous decision of the court to deviate from the guidelines *and the circumstances which caused the deviation have not changed*.

*Id*. (emphasis added). If there is a "significant variance" in this case – and we believe there is, as more fully addressed in the next section of this opinion – it is clear that it results from the fact that, under the trial court's order of January 19, 2000, Mother was not required to pay any general child support to Father. As to this last point, Mother takes sharp issue with our assertion that she was not required to pay child support under the earlier order. She points to the fact that she was required to

---

[6]Father strongly argues that the rationale used by the trial court to justify its deviation from the Guidelines in 2000 was legally insufficient to warrant that action. *Cf*. ***Jones v. Jones***, 930 S.W.2d 541 (Tenn. 1996). Mother contends that we cannot revisit that determination because it is a final, unappealed-from judgment. In any event, we do not find it necessary to resolve this dispute in order to decide the issues before us on this appeal.

pay – and did pay – one-half of Will's private school tuition and related private school expenses in 2002, all of which totaled in excess of $7,000. She claims this is child support.

Mother confuses "extraordinary educational expenses" with "base child support." In ***Barnett v. Barnett***, 27 S.W.3d 904 (Tenn. 2000), the Supreme Court differentiated between these two concepts. In ***Barnett***, the High Court stated that the amount of an "extraordinary educational expense," such as private school tuition "must be added to the obligor's percentage of child support computed under the guidelines." *Id*. at 907; *see also* Tenn. Comp. R. & Regs., ch. 1240-2-4-.04(1)(c) ("Extraordinary educational expenses . . . shall be added to the percentage calculated in [Tenn. Comp. R. & Regs., ch. 1240-2-4-.03]"). It is clear from ***Barnett*** that private school tuition and related expenses are an add-on to, rather than an element of, the "percentage of child support computed under the guidelines." ***Id***. It follows that Mother's "percentage of child support computed under the guidelines" in the trial court's order of January 19, 2000, was *zero* due to the trial court's decision to deviate from the Guidelines.

We recognize that there has been no change in a portion of the trial court's justification for deviating from the Guidelines. Mother was not employed at the time of the earlier order and was not employed at the time of the modification hearing. While we doubt that the "unemployment" of an obligor spouse with *liquid assets* in excess of $3.8 million[7] is particularly relevant to her parental responsibility to support her minor children,[8] we do not need to decide this issue. This is because we are convinced that the evidence preponderates in favor[9] of a finding that the trial court's other justification for deviating – the ability of Father "to provide for the needs of" his children – has changed somewhat.

Mother seems to suggest that we must focus only on her financial condition and not that of Father. We disagree. Under Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3) we must examine *all* of "the circumstances which caused the deviation." One of these circumstances is Father's financial condition.

When Father petitioned the court for custody of his children, he owned a restaurant and had recently sold his golf course for $1.75 million. He testified that he "was living off [his] interest income . . . and the stock market" when he requested custody. After receiving custody, Father sold the restaurant because he "could not raise children and run a restaurant." He received $40,000 as

---

[7]This was the total of Mother's liquid assets around the time of the trial court's January 19, 2000, order.

[8]One of the major goals in the development of the Guidelines was "[t]o ensure . . . to the extent that either parent enjoys a higher standard of living, the child(ren) share(s) in that higher standard." Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(2)(e).

[9]The trial court made no findings as to whether Father's financial condition had changed since the earlier order. Since the trial court failed to make a finding of fact as to this matter, "[w]e therefore must conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

a result of the sale. However, his finances took a downward turn when he lost "quite a bit of money in the stock market."

After selling his businesses and suffering losses in the stock market, Father obtained a real estate license. Father began selling real estate about six months before the hearing on April 23, 2003. Father testified that he had not yet earned a significant amount of income from his new vocation. Father also introduced an income statement that showed he had gross income of $32,258 in 2001 and gross income of $23,000 in 2002.

As to the other part of the equation – "the needs of the minor children" – Father testified extensively as to how the financial needs of the children had changed since the earlier hearing. Wagner was 15 at the time of the most recent hearing and Will was 12. Will attends a private school, McCallie, and Wagner goes to Lakeview Middle School. Both are very active in school and after-school activities – all at a substantial expense now being borne solely by Father.[10]

In our judgment, the circumstances that prompted the trial court to deviate from the Guidelines in its January 19, 2000, order have changed, at least in part. Therefore, if there is a significant variance due to the earlier deviation, we hold that there is a legal basis for revisiting Mother's child support obligation.

3.

Since Mother's percentage child support obligation was set at zero in the January 19, 2000, order, there is a "significant variance" if the Guidelines-mandated support based upon Mother's current net income is $15 or more per month. This is because the Guidelines, as pertinent to the facts of this case, define a "significant variance" as "at least fifteen dollars ($15.00) if the current support [in this case, zero] is less than $100.00 per month." Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3).

The trial court found that Mother's "income" was such that "the guidelines currently do not show any support . . . due." In our judgment, the evidence preponderates against this factual finding. While we are not able to say, at this time, exactly what Mother's percentage child support obligation should be for the relevant periods in this case, we are more than satisfied that it is substantially more than $15 per month.

In making its recent determination that Mother's income was not sufficient to warrant a finding of a percentage child support obligation, the trial court relied upon the testimony of Mother's attorney/CPA. That witness opined that, when Mother's capital *losses* are taken into consideration – including ones that are not deductible under the tax code – her income was as follows:

---

[10]There is proof in the record that Mother did contribute to the cost of the children's clothes.

|        |           |
|--------|-----------|
| 2001   | $14,000   |
| 2002   | <62,000>  |

The trial court, based upon the witness's testimony, took into account *all* of Mother's capital losses. The trial court referred to them as "negative capital gains."

While a federal income tax return is a valuable source of data when calculating an obligor's child support obligation under the Guidelines, it is important to recognize that the object of a tax return is very different from that of the Guidelines. A tax return is designed to determine "taxable income" under the federal tax code; the Guidelines are designed to determine "net income" *as that concept is defined in the Guidelines*. The Guidelines' "net income" concept is vastly different from the federal tax code's concept of "taxable income." By the same token, the Guidelines' concept of "gross income" is not the same as the federal tax code's concept of "adjusted gross income." Thus, while a tax return, generally speaking, will yield valuable *data* for a trial court in setting child support, it is a mistake to use the federal tax return as if the concepts mentioned above were interchangeable. They are not.[11]

Under the Guidelines, "gross income" includes "capital gains." However, the Guidelines' definition of "gross income" does not include a reference to "capital losses" or to "negative capital gains," nor are these terms mentioned in any other part of the Guidelines. We believe there is a good reason for this omission.

Generally speaking, in the typical non-installment sale of a capital asset at a profit, the seller immediately gets (1) a return of his cost or other basis and (2) his profit. The General Assembly, in adopting the Guidelines, made a policy decision that profit on the sale of a capital asset is a part of an obligor's gross income. This makes sense because, in the typical sale of a capital asset at a profit – say of a publicly-traded common stock – the seller receives cash representing a return of his cost or other basis and his profit. When one sells a capital asset at a loss, the loss simply erodes the seller's capital. The seller does not have "to go into his or her pocket" to pay for the loss out of other spendable funds. In the case of a capital gain, available funds to pay child support are supplemented while, in the other case – that of a capital loss – there is no decrease in spendable money; rather there is an erosion of the seller's capital asset base. While the federal government has made a policy decision to consider, in a limited fashion, the erosion of the taxpayer's capital asset base in calculating "taxable income," there is nothing to suggest that the Guidelines have adopted a similar approach to the calculation of "net income."

---

[11]Under the Guidelines, "gross income" has an expansive definition. For example, it includes such things as "gifts" and "judgments recovered for personal injuries." On the other hand, deductions from gross income under the Guidelines for the purpose of determining "net income" are few. Other than adjustments for the support of other children, these deductions are limited to "FICA [tax] . . . , the amount of withholding tax deducted for a single wage earner claiming one withholding allowance" and "reasonable expenses necessary to produce [self-employment] income." *See* Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(3)(A) & (4).

When *all*[12] of Mother's capital losses are ignored, it is clear that, under the language of the Guidelines, Mother had significant gross income and, hence, net income, in calendar years 2000, 2001, and 2002. Father, however, is not entitled to any modification of Mother's percentage child support obligation for any period prior to March 19, 2002, the date on which he filed the complaint seeking a modification. *See* Tenn. Code Ann. § 36-5-101(a)(5) (Supp. 2003).

4.

We do not believe we have sufficient information in the record to convert Mother's gross income from non-employment sources into net income under the Guidelines. Under the circumstances of this case, we hold that Father is entitled to an award of child support retroactive to the date of filing of his complaint for modification. In computing Mother's child support obligation for the nine months plus in 2002, the focus will be limited to Mother's net income for the year 2002; child support for 2003 and 2004 likewise will be computed based upon Mother's net income in the year for which support is being calculated.[13] This case is remanded to the trial court for the calculation of Mother's child support obligation for the period of March 19-31, 2002, and for all months thereafter until the trial court makes its determination upon remand. In addition, the trial court will need to set prospective child support at an appropriate level. For the purpose of reducing Mother's gross income to net income, the trial court's attention is called to the case of ***Alexander v. Alexander***, 34 S.W.3d 456 (Tenn. Ct. App. 2000), particularly the discussion at pages 465-66.

5.

We hold that Father is entitled to recover attorney's fees against Mother for services rendered by her counsel on this appeal. *See* Tenn. Code Ann. § 36-5-103(c) (2001); *see also **Deas v. Deas***, 774 S.W. 2d 167, 169 (Tenn. 1989). These fees will be set by the trial court on remand.

VII.

The judgment of the trial court is reversed. Costs on appeal are taxed to the appellee, Evelyn Marie Abercrombie. This case is remanded with instructions for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE

[12]By this, we mean the portion of the capital loss that is deductible under the tax code as well as the non-deductible amount.

[13]While we found income averaging to be appropriate in ***Alexander v. Alexander***, 34 S.W.3d 456, 460 (Tenn. Ct. App. 2000), we do not find it appropriate under the facts of the instant case.