IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2000 Session

## BOWDOIN GRAYSON SMITH v. GINGER LEE MARENCHIN SMITH

**Appeal from the Chancery Court for Smith County**
**No. 5800      Charles K. Smith, Chancellor**

---

**No. M2000-01094-COA-R3-CV - Filed May 2, 2001**

---

This is the second appeal regarding the setting of the amount of the father's child support obligation for four children.  In the earlier appeal, this court remanded for a determination of the father's actual net income and his corresponding child support obligation.  On remand, the trial court in early 2000 based its award of prospective support on an average of father's income in 1992 through 1995 and established the father's back support based on that figure.  We find that the prospective award should be set on the most current income figures, but that an average of the most recent years is appropriate.  We also find that the amount of back child support should be computed using actual income for the intervening years.  Because the record does not contain sufficient information regarding challenged deductions from gross income for the years now at issue, we remand for an evidentiary hearing on the father's income in the years since the divorce in 1996, and a redetermination of both prospective and back support.  We affirm the denial of prejudgment interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part,**
**Vacated in Part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P. J., M.S., and WILLIAM B. CAIN, J., joined.

James L. Weatherly, Jr., Nashville, Tennessee, for the appellant, Ginger Lee Marenchin Smith.

Randy Wakefield, Carthage, Tennessee, for the appellee, Bowdoin Grayson Smith.

**OPINION**

These parties were divorced in April of 1996.  They are both doctors and shared a medical practice, although the mother spent less time at her medical practice after the birth of the parties' children.  At the time of the divorce, the trial court established the father's child support obligation for the parties' four minor children, who were then all under the age of six, at $3,154 per month to be paid directly to the mother and an additional $2,000 per month to be paid into trust for the

children. The mother appealed the amount of child support, arguing that the trial court improperly applied the child support guidelines and failed to base the award on the father's total net income. *Smith v. Smith*, 984 S.W.2d 606 (Tenn. Ct. App. 1997).

This court agreed with the mother and remanded the case to the trial court "for the Trial Court's determination as to the father's actual net income, and corresponding child support award." *Id*. at 609. The trial court had not determined the father's actual net income, concluding that it was more than $6,250 per month. The trial court had apparently relied on *Nash v. Mulle*, 846 S.W.2d 803 (Tenn. 1993) and determined that it had discretion with regard to setting the amount of support for any net income over $6,250, and although the court had also ordered the father to make payments of $500 per child per month into a trust for the education of the children, this court determined that the total amount to be paid by the father did not "approach 46% of husband's recent incomes."

In that appeal, this court determined that the provision of the guidelines applied in *Nash* had been repealed after the *Nash* decision, and that the Tennessee Supreme Court had since spoken to the issue of high-income obligor parents. We stated:

> The only way in which cases where income exceeds $6,250.00 are treated differently is that the support exceeding this category may be put in a trust fund or other fund in the child's interest, instead of going directly to the custodial parent. Tenn. Comp R. & Regs. Ch. 1240-2-4.04(3). This change in the rules appears to have addressed the *Nash* Court's concern that the custodial parent could receive a windfall to access for personal use. Indeed, the Supreme Court in a post-*Nash* decision has indicated that there are very limited circumstances in which a downward deviation from the guidelines would be appropriate. *See Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996).

*Smith*, 984 S.W.2d at 609.

We also directed, "If the Court assesses less than a 46% rate against all net income, it must state its reason for deviating from the guidelines within the constraints of *Jones*."[1] *Id.*

Upon the mother's request, the trial court held a hearing on the order of remand, which began in December 1999 and concluded February 7, 2000. Thus, almost four years had passed between the original order setting child support and the hearing on remand.[2] At the first hearing on remand, the mother asked the trial court to determine the amount of the father's obligation for each year since

---

[1] There is no dispute that 46% is the correct percentage to be applied under the child support guidelines for four children.

[2] This delay was not attributable to lack of diligence on the part of the parties. In addition to the time spent on appeal in this court, the Supreme Court initially granted permission to appeal but later determined that such permission had been improvidently granted, and affirmed the opinion of the Court of Appeals.

the date of divorce, April 1996, based upon his actual income in each of those years. The father argued that the obligation should be set using facts that existed at the time of divorce. After discussion between the court and counsel, the trial court determined that it would set the father's child support obligation on an average of his income from the years 1992, 1993, 1994, and 1995. The trial court interpreted this court's opinion remanding the case as directing it to determine the father's actual net income at the time of the divorce.

The trial court also determined that it would adjust the father's 1995 income by subtracting income received due to a contract for emergency room services. Because that contract was eventually discontinued, sometime after the date of the divorce decree, the court determined that the income from it was an aberration which should not be considered. The mother also sought to have the court determine the father's arrearage, the difference between the amount he should have paid based on his income and the amount he actually paid since April 1996. The trial court required her to file a motion and stated it would consider the motion at the next hearing.

There was little real testimony at this first hearing. The mother introduced copies of the father's income tax returns for 1996, 1997, and 1998 into evidence. Also introduced were the father's tax returns for 1992, 1993, 1994, and 1995. At the close of the hearing, the court reiterated its position that it would consider only the income for 1992-1995, would average those years, and would set child support at 46% of that figure. The trial court ordered the father to have his accountant prepare a statement of income for each of those years and asked the parties to report back whether they were able to reach agreement on the figures to be used.

The parties did not agree on the father's income for purposes of calculating child support. At the second hearing, the mother reiterated her position that father was obligated to pay child support based on his actual income. In addition, the mother objected to reduction of father's gross income for losses he sustained in investments or business ventures separate from his medical practice. She argued that allowing those losses lowered the average and, because the trial court projected the 1992-95 average into the years beyond 1995, prolonged the effect of the losses even though those investments actually made money in later years. The father's accountant testified as to the father's income for the four years in question. His figures included downward adjustments from gross income for the business losses and for the 1995 income from the emergency room contract, which was $351,348. The figures also included depreciation deducted on the income tax returns but added back into the income because the accountant concluded that the child support guidelines do not allow reduction of income for depreciation. The accountant presented a summary of his calculations in an exhibit, which the court adopted, showing the father's net income as follows:

| Year | Net Income |
|------|------------|
| 1992 | $191,478 |
| 1993 | $242,122 |

| 1994 | $185,427 |
| 1995 | $202,227 |

The average for those years was determined to be $205,314. The court applied the guidelines' required percentage of 46% and set the father's child support obligation at $7,870 per month, with none of that amount required to be placed in trust. In addition to treating this as the amount which should have been set in April 1996, and the amount due in every month since the divorce, the court also ordered that this amount would be paid beginning in March 2000. The court then calculated the arrearage due the mother by subtracting the amount paid by father since May 1996, pursuant to the original divorce decree at $ 3,154 per month in direct payments to the mother and $2,000 per month into the trust, from the amount due under the new calculations, and ordered the father to pay $130,358 in arrearage through February 2000. The trial court denied the mother's request for pre-judgment interest because "it was improper to punish the father who was not responsible for any mistakes in calculating the child support." The trial court awarded the mother $7,000 in attorney's fees, approximately half her fees.

## I. Nature of Child Support Obligation

The mother's first, and primary, argument in this appeal is that the trial court should have used the father's actual income for the years 1996, 1997, 1998, in determining the father's obligation for those years and should have used the average of his income for 1997 and 1998 in setting the amount which should have been paid in 1999,[3] and in setting the father's future child support obligation.

Every parent is obligated to support his or her children during their minority. Tenn. Code Ann. § 34-11-102. The obligations of parents to support, care for and nurture their children are joint, and the extent of their duty to support depends on their ability to provide that support. *State ex rel. Grant v. Prograis*, 979 S.W.2d 594, 600-601 (Tenn. Ct. App. 1997). If necessary, the courts may apportion the responsibility for support between the parents according to their respective abilities to provide support. *Id.* at 601. Accordingly, relevant statutes and regulations governing child support are intended "to assure that children receive support reasonably consistent with their parent or parents' financial resources." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248-49 (Tenn. Ct. App. 2000).

When, as in this case, a marriage is dissolved, courts are authorized by statute to provide for the future support of minor children by fixing a definite amount to be paid on a specified regular basis. Tenn. Code Ann. § 36-5-101 (a)(1) and (a)(2)(A). Further, courts are directed to apply the child support guidelines developed by the Department of Human Services in determining the amount of any such support. Tenn. Code Ann. § 36-5-101(e)(1). The child support guidelines require a

---

[3]The father's 1999 income tax returns were not available when the hearings were held in this matter.

noncustodial parent to pay a support amount which is determined by "a flat percentage of the obligor's net income." Tenn. Comp. R. & Regs. ch. 1240-2-4-.03(2). The applicable percentage is determined by the number of children to be supported. The amount dictated by the guidelines is to be applied by the courts as a rebuttable presumption of the correct amount of support. Tenn. Code Ann. § 36-5-101(e)(1).

In the most common situation, the guidelines are applied in the context of establishing an award of prospective payments, whether it is an initial award or a modification. That is, the court uses the guidelines to set the amount that the obligor parent will pay in the future unless and until the amount is modified by court order or the obligation terminates. Because the child will receive prospective support based upon the court's determination of the obligor parent's income, "[d]etermining the amount of the non-custodial parent's income is the most important element of proof in a proceeding to set child support . . . and when considering requests for modification of an existing support obligation." *Turner v. Turner*, 919 S.W.2d 340, 344 (Tenn. Ct. App. 1995).

In the case at hand, the initial award was made at the time of divorce, in April 1996. However, that award was determined by this court to have been incorrectly calculated. On remand, the trial court interpreted its duty to establish the support due at the time of the divorce, based on the father's income at that time, even though four years had passed. The court, placing itself in the position it would have been in April 1996, determined the father's then-current income based on information which would have been available at that time, the father's income from 1992 through 1995, even though the father's actual 1996 income was known at the time of the hearing on remand. The court then determined the child support due in each of the intervening years on the basis of its estimate of the father's 1996 income, although information about the father's actual income for each of those years was available. Finally, the trial court set the father's obligation for prospective support payments, to begin March 2000, based on its estimate of the father's 1996 income, which was a product of averaging the father's income in 1992-1995.

We agree that the trial court was required to perform several tasks in order to resolve the issues presented by the procedural posture of this case on remand. Our task is to review how the court determined the amount of support due, both prospectively at the time of the remand hearing and retrospectively for those years when support was clearly due but was being paid in an incorrect amount.

## II. Prospective Child Support

We first address the award of prospective child support from March 2000 forward. The court set the amount of that obligation on the basis of the father's income in 1992, 1993, 1994, and 1995. We find no basis for establishing prospective support using income figures at least five years old.

One of the stated goals in the development of the guidelines was "[t]o ensure that when parents live separately, the economic impact on the child(ren) is minimized and to the extent that either parent enjoys a higher standard of living, the child(ren) share(s) in that higher standard."

Tenn. Comp. R. & Regs. 1240-2-4-.02(2)(e). Thus, courts are to set the amount of prospective child support so that children will receive support reasonably consistent with their parents' resources and ability to provide support. These goals are best fulfilled by use of current, accurate information regarding the obligor parent's income.

The guidelines specifically recognize that the court needs reliable information regarding the "current ability to support" when establishing or modifying a support order. Tenn. Comp. R. & Regs. 1240-2-4-.03(3)(e) and (f). Otherwise, there could be no reasonable assurance that the children are receiving support commensurate with the parent's ability to provide support. Because child support is based on income, an award for future support, including a prospective modification, is necessarily based upon most recent actual income.

Therefore, we conclude that the amount of child support to be paid by the father prospectively from March 2000 should have been set based upon a determination of his income at the time of the hearing on remand, not on his income five to eight years earlier.

The problem with the trial court's method of setting prospective child support lay primarily in its use of outdated income figures, not in its averaging the father's variable income in order to arrive at a reliable income figure. The child support guidelines provide that "the child support award is based on a flat percentage of the obligor's net income." Tenn. Comp. R. & Regs. ch. 12-2-4-.03(2). Net income is defined as gross income, which is "all income from any source," minus certain specified deductions such as income tax and social security contributions. Tenn. Comp. R. & Regs. ch. 1240-2-4-.03(3). Often, the determination of gross income or net income is based on a relatively invariable income, such as a salary. Where, however, the obligor parent's income is subject to variation, averaging is appropriate to determine net income for the purpose of calculating child support. *Alexander v. Alexander*, 34 S.W.3d 456, 460 (Tenn. Ct. App. 2000).

The guidelines specifically allow averaging in determining gross income when establishing a prospective award: "[v]ariable income such as commissions, bonuses, overtime pay, and dividends, etc., should be averaged and added to the obligor's fixed salary." Tenn. Comp. R. and Regs. 1240-2-4-.03(3)(b). Although that provision of the guidelines applies to variable components of income, the reasoning is just as applicable to situations where a parent is self-employed or whose total income is variable.

Another provision in the guidelines authorizes averaging for establishing the obligation for past support. Under the heading "Criteria for Deviation from Guidelines," the following directive is given:

> In cases where the initial support is being set, a judgment must be entered to include an amount due for monthly support from the date of the child's birth or date of separation or date of abandonment whichever is appropriate, until the current support order is entered. This amount must be calculated based upon the guidelines using the

average income of the obligor over the past two years and is presumed to be correct unless rebutted by either party. . . .

Tenn. Comp. R. & Regs. ch. 1240-2-4-.04(1)(e).

Referring to this provision, this court has stated:

> While this provision does not mandate that trial courts average variable monthly income from the past two years to determine gross income for current child support, it does reflect the legislative intent that when the exact amount of gross income is not known an average must be taken, and a period of two years is an appropriate time period to average than income.

*Brown v. Brown*, No. 03A01-9812-CV-00417, 1999 WL 552854 at \*5 (Tenn. Ct. App. July 28, 1999) (no Tenn. R. App. P. 11 application filed).

While our courts have approved or endorsed a two year period for purposes of averaging, *see, e.g., Norton v. Norton*, No. W1999-02176-COA-R3CV, 2000 WL 52819 at \*7 (Tenn. Ct. App. Jan. 10, 2000) (no Tenn. R. App. P. 11 application filed), other time periods have also been used. *See, e.g., Siegel v. Siegel*, No. 02A01-9708-CH-00198, 1999 WL 135090 at \*6 (Tenn. Ct. App. March 5, 1999) (no Tenn. R. App. P. 11 application filed) ("Based on the entire record, it appears that Husband's earnings for the entire twelve months of 1996 best reflect his income and earning capacity for the purpose of determining child support and alimony."); *Alexander*, 34 S.W.3d at 460 (four years income averaged). The time period to be used lies within the discretion of the trial court based upon the facts of the situation.

> The guidelines themselves do not prescribe how variable income should be averaged. Therefore, it is left to the courts to determine on a case-by-case basis the most appropriate way to average fluctuating income.

*Hanselman v. Hanselman*, No. M1998-00919-COA-R3-CV, 2001 WL 252792 at \*3 (Tenn. Ct. App. March 15, 2001). However, periods of one year or longer have been consistently approved or applied depending on the circumstances. *Id*. at \*4 (determining that averages of short duration are generally inappropriate, and listing cases approving averaging over more than one year); *see also Brown*, 1999 WL 552854 at \*6 (author of concurring opinion expresses view that the two-year average approach may not be appropriate in all cases.)

The father in this case is self-employed primarily as a physician, and his yearly income is subject to variation. Therefore, we see no error in establishing his current income by averaging his income from the two years prior to the establishment of the prospective award, as asserted by the mother. However, we also see no necessity for choosing two years rather than some other period of

time that the facts of this case may indicate is more likely to accurately reflect the father's current ability to pay prospective support.

### III. Back Child Support

We turn now to the trial court's calculation of back support. The father's obligation to provide support was established by court order in April of 1996, and the law in effect required him to pay support at 46% of his actual net income. Accordingly, this court's opinion remanding the case directed the trial court to determine the father's actual net income and to set the child support at 46% thereof. We interpret our earlier ruling in this case as affirming the children's right to support, computed under the guidelines at 46% of the father's actual net income, unless the trial court made the requisite finding that deviation from the guidelines was appropriate.[4]

For the years between the initial entry of the order obligating the father to pay child support until the order on remand, we can find no basis for ignoring actual income and establishing support on outdated projections of income.[5] The amount of the father's obligation for past years should be determined using actual income figures.

In *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn. Ct. App. 1998), this court vacated the trial court's child support award and remanded for the second time for calculation of the appropriate

---

[4]On remand, the trial court did not determine that deviation from the guidelines was justified, and that is not an issue in this appeal. *See* Tenn. Code Ann. § 36-5-101(e)(1) (providing the requirement that the trial court make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case as a prerequisite to rebutting the presumption that the guidelines provide the appropriate amount of support).

[5] The fact that this case was remanded for determination of the father's actual net income and corresponding child support award, but the remand hearing was not held until four years after the divorce, created a problematic procedural situation. On appeal the father argues that the trial court was correct is setting back support on the basis of projected income and maintains that the mother could have filed, during the intervening years, a petition to modify the child support obligation based on the father's increased income. That argument ignores the fact that this court had determined that the amount originally set by the trial court was incorrect and had remanded for determination of the correct amount. Therefore, the mother had already taken the procedural steps necessary to have the amount of support calculated; further, she was entitled to have the correct amount set and had no reason to ask for a modification of a correct amount which was then unknown. The other side of the mother's quandary is demonstrated by a ruling of the trial court. Between the first and second hearing on remand the mother filed a petition to increase child support asking that the court grant an increase for 1997 based on 1996's actual income, an increase for 1998 based on 1997's actual income, and an increase for 1999 based on 1998's actual income. The mother's counsel explained that this motion was based on comments made by the court at the first hearing on remand. The trial court concluded that it could not retroactively increase the support amount beyond the date the petition was filed in early 2000, a correct statement of the general rule. Tenn. Code Ann. § 36-5-101(a)(5). Thus, the mother had no reason to request an increase while anticipating that the support would be established in the correct amount, but was precluded from requesting such an increase retroactively when she learned that the support for the intervening years was to be set on outdated figures.

amount of support, having reached the conclusion "that Mr. Anderton's child support obligation has been seriously miscalculated from the beginning."[6]  *Id*.  We then stated:

> The amount of child support required by the guidelines is presumptively correct.  In the absence of any definitive written findings by the trial court setting forth cogent reasons to deviate from the guidelines, Mr. Anderton's child support obligation since June 1995 should have been consistent with the preceding discussion.  Since it was not, Mr. Anderton's current child support obligation and the arrearage must again be determined by the trial court.  Unless the trial court finds reasons for deviating from the guidelines, it should set Mr. Anderton's current child support obligation in accordance with the child support guidelines.  It should then recalculate the amount of the arrearage consistent with Mr. Anderton's **actual net income** during the relevant periods using the formula required by the guidelines.

*Id*. at 681-82 (citations omitted) (emphasis added).

Like the *Anderton* court, we conclude that the father's child support obligation in this case has been miscalculated from the date of divorce, as determined in our opinion in the earlier appeal.  To the extent the father has paid amounts since the date of divorce which are substantially less than the amount he should have paid, he owes back child support.  The way to determine the arrearage is to recalculate the correct amount for each of the years since the divorce decree and subtract the father's actual payments.  The trial court performed this calculation, but used the father's 1992-1995 average in determining the amounts which should have been paid, in effect using a projection for the father's income for 1996, 1997, and 1998.  Like the *Anderton* court, we conclude that the correct amount for those years is determined by using the obligor parent's actual income.

This approach is the same as that used in cases where, although the obligation to support a child existed from the child's birth, an order establishing the paternity of the child and setting prospective and past support is not entered until a number of years after the birth.  For example, in *State ex rel. Vaughn v. Kaatrude*, the biological father was unaware he had a child until the state Department of Human Services, on behalf of the mother, initiated proceedings to establish paternity and to obtain past and future child support when the child was fifteen years old.  When blood tests confirmed he was the child's biological father, Mr. Kaatrude indicated his willingness to pay support prospectively.  This court affirmed the trial court's determination that he should also pay child

---

[6]This conclusion was reached by applying certain "straightforward principles:" that income can be determined by ascertaining either the gross or net income according to the directives of the guidelines; that the guidelines require that variable income such as bonuses and commissions should be averaged and added to the obligor parent's fixed salary; that courts are to calculate the required amount of support using the percentages in the guidelines applied to the relevant income; and that generally, the resulting amount is the parent's child support obligation, absent a finding by the court that a deviation is warranted.  Finally, we recognized that the guidelines as they existed when the order was first entered recognized alternative arrangements for wealthy parents with a net monthly income in excess of $6,250, which included payment of some portion of the support obligation into a trust for the child's benefit. *Anderton*, 988 S.W.2d at 680-81.

support going back to the birth of the child. 21 S.W.3d at 248. In explaining the reasons for an award of back support, this court stated:

> Mr. Kaatrude's duty to provide support existed during all those years, and his lack of financial assistance during that time either required Ms. Vaughn to shoulder more than her share of the support responsibility or, more likely, caused the child to get by with less. An award of back child support fills this gap.

*Id.*

With regard to the proper amount of back child support in *Kaatrude*, we vacated the $50,000 award ordered by the trial court because there was no evidence introduced at trial which established that the amount of the award bore a "traceable relation to Mr. Kaatrude's actual ability to support his son from 1981 to 1996." *Id.* at 249. Determining that the record did not allow us to do complete justice, we remanded the case to the trial court to calculate the father's back child support using the guidelines, with specific instructions that the parties should be permitted to present evidence concerning the father's earnings for the relevant years. "Based on this evidence, the . . .court should then determine Mr. Kaatrude's back child support obligation for each year based on the guideline percentage applicable to that particular year." *Id.* at 250.

Similarly, in *State Dep't of Human Servs. v. Springs*, 976 S.W.2d 654 (Tenn. Ct. App. 1997), we affirmed the trial court's award of back child support in a paternity action. The amount of the award was calculated by applying the guidelines instructions to the father's gross monthly income during the years from the child's birth until his majority.[7] *Id.* at 655.

In the case before us, the obligation to provide support has existed since the divorce, but the amount of the obligation has not been correctly set, and the amount of back support cannot be determined until that is done. The situation is similar enough to the cases involving calculation of back support in late-discovered paternity cases for us to use those cases for additional guidance.

Therefore, we conclude that the amount of back child support owed by the father should have been calculated using his actual income for each of the years since the divorce, proof of which was available at the time of the remand hearing.

---

[7]The *Springs* court recognized the distinction between prospective child support and back child support in paternity cases, relying on *Kirchner v. Pritchett*, No. 01A01-9503-JV-00092, 1995 WL 714279 (Tenn. Ct. App. December 6, 1995) (no Tenn. R. App. P. 11 petition filed). Back child support in paternity cases is not required to be set in strict accordance with the guidelines. "That is not to say that a trial court, in the exercise of its broad but sound discretion, could not award child support back to the date of the child's birth in an amount calculated in strict adherence to the formula set forth in Tenn. Comp. R. & Regs., ch. 1240-2-4-.03." *Springs*, 976 S.W.2d at 656. No such discretion applies in this case; the child support herein, both prospective and back support, must be set in compliance with the guidelines.

IV.  Determination of Income

The mother also objects to the trial court's calculation of income because of the exclusion of income in 1995 from an emergency room services contract and the allowance of deductions for various business or investment losses during the years used in the averaging to arrive at the father's income.  Because the court used an average income which allowed these exclusions and deductions to set support for later years, the mother argues that the effect of these improper calculations was exacerbated. Our determination that back support should be based on actual income for the intervening years renders some of these objections moot.

The actual income for 1996, for example, will include any amounts earned from the emergency services contract, because it clearly falls within the guidelines' definition of gross income, "all income from any source . . ., whether earned or unearned, and includes . . . income from self-employment." Tenn. Comp. R. & Regs. ch. 1240-2-4-.03(3)(a).  The trial court's concerns about the fairness of setting child support on an income amount that included earnings from a contract which no longer existed at the time of the hearing, as well as mother's objections to the effect on subsequent payments by averaging in an amount which excluded that income, are eliminated by our determination on the method for setting  the amount of back support.

However, the issues raised by mother regarding allowable deductions from gross income, while moot as to pre-1996 income, must be considered in the context of determining the father's actual income for 1996 through the present for purposes of setting the amount of back as well as prospective support.   In the years 1992 through 1995, the father claimed on his tax returns various losses from business ventures or investments other than his medical practice.[8]  The trial court allowed these same deductions from income, except for depreciation, in determining the father's actual income.  Because the father's tax returns for 1997 and 1998 reflect similar deductions from gross income, the issues surrounding the consideration of losses from secondary business ventures remain.

The mother's proof includes a calculation of father's net income (total income minus specified allowable deductions) for each of the years in question as follows:

| Year | Monthly Net Income | Yearly Net Income |
|------|--------------------|-------------------|
| 1996 | 23,676.71 | 284,120.52 |
| 1997 | 31,063.97 | 372,767.64 |

[8]For example, in 1994 the father claimed losses of $81,389 from JAPOP Productions; in 1995 he claimed deductions of $73,287 for JAPOP Productions and $37,171 from Tiff Arnold Paving.

-11-

| | | |
|---|---|---|
| 1998 | 21,173.43 | 254,081.16 |

A closer examination of the mother's calculations demonstrates the continuing existence of the issues she raised regarding allowability, for child support purposes, of various losses allowable for income tax purposes. In her calculations for 1997, the mother included the father's self-employment income from his medical practice, as shown on his tax return, but did not subtract the depreciation allowed by tax law but not allowed by the child support guidelines, which made the father's self-employment income $459,688.[9] To this she added wages, as shown on the tax return, of $79,710 from the medical practice and $4,747 from Tiff Arnold Paving. She also added $65,406 in investment income. That amount is the sum of three lines on the father's 1040: capital gains, dividends, and interest. These amounts totaled $609,551, which the mother treated as the father's gross income. From that amount she deducted allowable income tax, FICA, and Medicare payments, arriving at a total net income for that year of $372,767, or $31,063.97 per month.

In her calculations of the father's gross income for 1997, the mother did not deduct certain losses claimed on his tax return, specifically: $151,928 in losses from partnerships and subchapter S corporations (described in the return as a nonpassive loss from an "S" corporation, Bulldog Productions) and $29,054 in investment interest expense (including disallowed expense from 1996), which amount was claimed as part of the father's itemized deductions and reduced his taxable income. The parties disputed the appropriateness of similar deductions with regard to the father's 1992 - 1995 income; thus, those disputes appear to remain with regard to 1996 and later.

The mother's basic argument is that the father's primary employment is as a physician and that his net self-employment income from that activity should not be reduced by losses sustained in other activities, such as the paving company and the productions company.

A review of Tennessee cases involving secondary business ventures or investments reveals few hard and fast rules, but some guiding principles useful for analysis of a particular fact situation can be gleaned. In a recent case, *Alexander v. Alexander*, this court refused to allow deduction from gross income, which came from a number of other sources, for losses sustained in a business enterprise, stating:

> By the same token, we also agree with the trial court that the net losses from DJA Leasing should not be utilized to reduce Father's other sources of income in determining his net income under the Guidelines. There is no proof in the record that Father was required to "go into his pocket" to cover these losses. They are paper losses only - - losses that enabled Father to shelter other sources of income from

---

[9]The mother's calculations do not challenge any business expenses from the medical practice as unreasonable, and she has appropriately added in the depreciation deduction claimed on the tax returns. "Income from self-employment includes income from business operations and rental properties, etc., less reasonable expenses necessary to produce such income. Depreciation, home offices, excessive travel, excessive car expenses, or excessive personal expenses, should not be considered reasonable expenses." Tenn. Comp. R. & Regs. 1240-2-4-.03(3)(a).

federal income tax. Accordingly, Father's net "losses" from the operation of DJA Leasing cannot be considered in determining his net income to set child support.

*Alexander*, 34 S.W.3d at 462.

While the quoted language in *Alexander* implies a different result if the losses were more than "paper losses" or tax shelters, but resulted in an actual decrease in the parent's income, other language in that opinion suggests that the guidelines provide the appropriate guidance on this issue. The *Alexander* court, when discussing how to convert gross income to net income, noted that because the leasing business at issue resulted in net losses rather than net income, there was no self-employment *income* and, therefore, Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(4)'s instructions for calculation of reductions from gross income for the obligor's FICA tax on *income* from self-employment had no applicability. *Id*. at 465.

The language of the guidelines' definition of gross income also uses the term "*income* from self-employment," and the guidelines make no reference to losses from self-employment. This treatment by the guidelines apparently formed the basis of this court's holding in *Humphrey v. O'Conner*, No. 01A01-9502-PB-0006, 1995 WL 428679 (Tenn. Ct. App. July 21, 1995) (perm. app. denied Nov. 20, 1995), wherein the obligor parent sought to reduce her income from salary for her regular job by losses on rental property. Without discussion, this court noted that the guidelines contain no provision for decreasing gross earnings by business losses and affirmed the trial court's award of child support based upon the salary unreduced by outside business losses. *Id*. at *7-8.

The same result was reached, but partly on different grounds, in *Howard v. Howard*, No. 03A01-9811-CV-00374, 1999 WL 427596 (Tenn. Ct. App. June 25, 1999) (no Tenn. R. App. P. 11 application filed). In that case, the obligor parent's primary occupation was as an employee of an insurance company, from which he earned approximately $89,000, and he had other sources of income. For tax purposes, he claimed a business loss of $32,762 from a sole proprietorship sports card business. That business had earned a gross profit of $48,300, but the parent claimed expenses of $81,000, including a salary to his wife. The trial court refused to deduct the business loss from the father's other income, finding the father's gross income to be roughly $95,000. We stated, "The Trial Court then found that the father realized no income as a self-employed individual, because his claimed expenses exceeded his income from the business." *Id*. at *2. However, this court affirmed the trial court's finding on a slightly different basis, that the father had failed to prove the claimed expenses were reasonable. *Id*.

Two other cases, relied upon by the parties, should be examined. In *Kimble v. Kimble*, No. 02A01-9503-CV-00049, 1996 WL 445272 (Tenn. Ct. App. Aug. 8, 1996) (no Tenn. R. App. P. 11 application filed), this court considered whether capital expenditures may be used to reduce the gross income of a self-employed obligor parent, and concluded that the trial court has discretion to determine whether such expenditures are "reasonable expenses to produce such income" under Tenn. Comp. R. & Regs. ch. 1420-2-4-.03(3). 1996 WL 445272 at *5. We are not convinced that

this holding has any direct applicability to the issues presented in this case, because the mother does not object to any expenses associated with the father's medical practice, and because *Kimble* does not deal with more than one source of self-employment income.[10]  However, in *Kimble*, this court relied upon cases from other jurisdictions in establishing principles which provide some guidance in our analysis: first, that any business expenses must have been incurred in an activity intended to produce income; second, that those expenses must have been reasonable, ordinary, or necessary; and third, that such expenses be actual cash or out-of-pocket expenditures. *Id*. at *3-4.  Conversely, where expenditures are appropriately characterized as "investments" which benefit the obligor parent, or are merely non-cash or paper losses for tax deduction purposes, they are not allowable as reasonable expenses to be deducted from self-employment income. *Id.*  The trial court is charged, in the first instance, with making the necessary factual determinations.

Finally, in *Norton v. Norton*, No. 02A01-9901-CH0030, 2000 WL 52819, this court held that interest payments on loans to acquire capital for the obligor's business were generally[11] allowable deductions from self-employment income "because they represent out-of-pocket expenses that are never recouped by the obligor." *Id.* at *7. *Norton* involved an obligor parent with several businesses, and nothing in the opinion indicates that he had a primary occupation or business.  *See also McDuffee v. McDuffee*, No. 90DR-896, 1993 WL 339302 at *6  (Tenn. Ct. App. Sept. 8, 1993) (no Tenn. R. App. P. 11 application filed) (this court treated obligor parent's self-employment ventures collectively for determining net income.)

Where, however, as in this case, an obligor parent has a primary occupation or profession which provides the primary source of income, we find no basis in the guidelines for allowing deduction of losses from other business ventures from that primary income.  The guidelines include in gross income "[i]ncome from self-employment." Thus, where self-employment activities produce income, after deduction of "reasonable expenses necessary to produce such income," that income is includable as gross income.  The guidelines do not expressly address how to treat losses from self-employment activities where the reasonable deductions exceed the income.  However, we do not find any basis in the guidelines for deducting losses from one self-employment enterprise from the income of another  unrelated and successful source of income from a primary profession or occupation.  Similarly, while income from investments, "whether earned or unearned" is includable in gross income, we find no basis in the guidelines for reducing gross income by investment losses

---

[10]Based upon the record before us, we are unable to determine whether the father's involvement in the companies for which he has claimed losses amounts to self-employment or should be considered investments.  We do note, however, that the father has paid self-employment tax only on his earnings from his medical practice, a fact considered significant in *Alexander,* 34 S.W.3d at 465.

[11]This court recognized exceptions to this general statement where the facts indicate the interest expenses are not reasonable or necessary.  *Norton*, 2000 WL 52819 at *7 n. 6.

which exceed investment income.[12]  Where an obligor parent has the ability through a primary occupation or profession to produce income which will provide his or her children with support, as a general rule, any losses they sustain in voluntary outside business ventures cannot be used to reduce the support obligation.  Specific factual situations may justify departure from this general principle.

Decisions from other jurisdictions are in accord with this general approach.  *See, e.g.*, *Wilhelm v. Wilhelm*, 543 N.W.2d 488, 491 (N.D. 1996) (obligor's losses as a rodeo rider could not be used to decrease his income from his salary at his regular job, because the rodeo venture was an avocation); *Meyer v. Meyer*, No. A-93-579, 1995 WL 676409 at *4 (Neb. App. Nov. 14, 1995) (losses from obligor's health food business could not be used to reduce income from military pay because the business was a future investment, not intended to be a primary source of income, and obligor continued the venture although it was operating at a loss). As one court has observed, "Either parent may freely engage in entrepreneurial endeavors, but these excursions will not relieve them of their parental obligations." *Meyer*, 1995 WL 676409 at *4 (citing *Dworak v. Fugit*, 1 Neb. App. 332, 495 N.W.2d 47 (1992)); *see also Koch v. Koch*, 714 So.2d 63, 66-67 (La. App. 4 Cir 1998) (obligor parent cannot rely on his voluntary investment choices to reduce his support obligation).

The mother takes the position that the record before us is sufficient to allow this court to perform the necessary calculations to establish the father's support obligations, prospectively and retrospectively.  We are unable to agree.

The mother has presented evidence of the father's income for 1996, 1997, and 1998. Therefore, the burden shifted to the father to dispute her calculations or present evidence relevant to the determination of his income under the guidelines.[13]  The father presented no evidence to

---

[12]The distinction between self-employment and other types of business ventures, such as investment, is not always clear, and, in the case before us no evidence exists from which we can determine whether the losses and deductions at issue were the result of self-employment or investment.  While the guidelines recognize allowable deductions from self-employment income for reasonable expenses necessary to produce income, no such language exists regarding investments.  With regard to business ventures that are secondary to a primary profession or source of income, however, we think the distinction makes no difference: losses in voluntary business ventures not related to or necessary to the income-producing primary occupation generally should not be used to reduce gross income from the primary source of income.

[13]We have previously held that because the child support guidelines embody a rebuttable presumption that the custodial parent is entitled to receive financial support from the noncustodial parent, once the custodial parent proves custody, the burden of going forward with proof relating to income may shift. *Kirchner v. Pritchett*, 1995 WL 714279 at *3.  In that case, despite discovery attempts by the mother, the evidence at trial regarding the father's past income and expenses was sketchy at best. Although our opinion was based on a situation where the noncustodial parent, who was most able to provide information on his income, was unable or unwilling to produce satisfactory evidence, the following rationale also applies in other situations:

If the noncustodial parent has not already submitted proof of his or her income, the custodial parent

(continued...)

challenge the calculations submitted by mother because he submitted no evidence at all regarding the years after 1995. Based on the trial court's earlier ruling, the father's accountant testified about various aspects of the father's income and tax returns for 1992-1995, but not about any later years. Thus, the record before us does not include any of the kind of factual information needed to determine which, if any, of the claimed deductions or losses should be allowed.

While the father did not provide such proof herein, we do not think he should be precluded from doing so. He acted in conformance with the trial court's ruling that it would set the support obligation on the basis of 1992-1995 income and the directive that his accountant prepare the figures for those years. Therefore, we think the father should have the opportunity to present evidence to challenge the income figures propounded by the mother and to advocate for the exclusion of items included by the mother in her calculations.[14] Thus, we decline to set the father's child support amounts on the basis of the mother's unchallenged calculations. Further, we are unable, with only the unexplained tax returns appearing in the record, to make the necessary determinations on the inclusion or exclusion of specific items from the calculation of the father's gross or net income for child support purposes. Therefore, we must remand this case to the trial court for the taking of evidence relevant to determination of the father's income for each of the years relevant to prospective and back support.[15]

On remand, the trial court shall set the prospective child support on the basis of the father's actual recent income, which may be determined by averaging his income in the number of years determined by the trial court to be the most appropriate for predicting future income, but no more than four. The court shall include in the average the most recent year for which information is available.[16] The gross income for each year shall be determined by the court, after proof, in accordance with the principles set out above regarding losses and deductions from secondary

_____

[13](...continued)
may present evidence of the noncustodial parent's income obtained during discovery, as well as other evidence of the need for more support than the guidelines require. Thereafter, the burden shifts to the noncustodial parent to dispute the custodial parent's evidence, to present proof of other factors affecting the amount of support, or to demonstrate why the trial court should depart from the guidelines.

*Id.* (citations omitted).

[14]We note that an obligor has the burden of demonstrating that a challenged business deduction is a reasonable expense necessary to produce income. *Norton*, 2000 WL 52819 at *5. Similarly, on remand, the father will have the burden of establishing the allowability for child support purposes of any reductions in gross income he claims.

[15] This court may remand cases where we determine that complete justice cannot be done on appeal and where the record indicates that more satisfactory evidence can be presented on remand. *Kaatrude*, 21 S.W.3d at 250.

[16]At the February 2000 hearing, the father's tax return for 1999 was not available, and apparently no other evidence of his 1999 income could be produced at that time. Presumably it would be available for any hearing on remand, and information on his 2000 income may also be available.

business or investment activities and in accordance with the guidelines.  Net income shall be determined by the formula set out in the guidelines.

Back child support shall be determined by calculating the child support due based on the father's actual income for 1996, 1997, 1998, 1999, and 2000 and subtracting therefrom the amounts actually paid by the father during those years.  The mother is entitled to an award of the difference as back child support.

## V.  Prejudgment Interest

The mother next argues that the trial court should have granted her request for prejudgment interest on the arrearage, or back child support. She argues that since the arrearage was calculated using the father's accountant's testimony, the father cannot in good faith argue that the amount is incorrect or that he was not obligated to pay on the basis of a correct determination of his net income. She also argues that the trial court mistakenly considered an award of prejudgment interest to be punitive in nature.

The relevant statute provides that prejudgment interest "may be awarded by courts or juries in accordance with the principles of equity . . ." Tenn. Code Ann. § 47-14-123.  Where the amount of an obligation is certain, or can be ascertained by a proper accounting, and the obligation is not disputed on reasonable grounds, courts may allow prejudgment interest, because loss of use of funds by the obligee is the result of the failure to pay an obligation according to its terms, and interest is the usual means of compensating for this loss of use. *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994).  The decision whether to award prejudgment interest is within the discretion of the trial court. *Spencer v. A-1 Crane Service, Inc.* 880 S.W.2d 938, 944 (Tenn. 1994); *Brandt v. Bib Enterprises, Ltd.*, 986 S.W.2d 586, 595 (Tenn. Ct. App. 1998).  The same standard applies to past child support obligations. *Silverstein v. Rice*, No. W1999-01336-COA-R3-CV, 2000 WL 33146933 at *5 (Tenn. Ct. App. Oct. 20, 2000) (perm. app. denied Apr. 9, 2001).

A party seeking to have a lower court's holding overturned on the basis of abuse of discretion undertakes a heavy burden.  The abuse of discretion standard is intended to constrain appellate review and implies "less intense appellate review and, therefore, less likelihood of reversal." *BIF v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409 at *2 (Tenn. Ct. App. July 13, 1988) (no Tenn. R. App. P. 11 application filed).  As a general principle, an appellate court will not reverse a decision that lies within the discretion of the trial court unless it affirmatively appears that the lower court's decision was against logic or reasoning and caused injustice to the complaining party. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). The fact that a decision is discretionary with a trial court necessarily implies that the trial court has a choice of alternatives among a range of acceptable ones; the reviewing court's job is to determine whether the trial court's decision is within the range of acceptable alternatives, given the applicable legal principles and the evidence in the case.  "While we will set aside a discretionary decision if it rests on an inadequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of

the trial court merely because we might have chosen another alternative." *Kaatrude*, 21 S.W.3d at 248.

In the case before us, the father has paid child support in the amount initially set by the trial court. This court found that amount to be incorrect, but remanded for determination of the correct amount. Under the facts of this case, we do not find that it was inequitable for the trial court to refuse to grant the mother prejudgment interest, and, therefore, find that the court's decision was within the range of acceptable alternatives. We affirm the denial of prejudgment interest.

## VI. Conclusion

Based on the reasoning set out above, we vacate the trial court's award of child support and hold that prospective child support should be set using the most current income information and that the back child support should be computed using actual income figures for each year since 1996. Because the record does not contain all the evidence necessary for this court to calculate the father's actual net income, we must remand the case for the trial court to take such evidence as is necessary and to establish the father's prospective support obligation, from the date of the order on remand, and to establish the father's back support obligation, up to the date of the order on remand, in accordance with the instructions in this opinion. The father shall continue to pay child support in the amount set by the trial court, $7,870 per month, until the order on remand is entered. The court's denial of prejudgment interest is affirmed.

The case is remanded for such further proceedings as may be necessary, consistent with this opinion. The costs of this appeal are taxed to the Appellant, Bowdoin Grayson Smith, for which execution may issue if necessary.

\

_____
PATRICIA J. COTTRELL, JUDGE

-18-