IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 3, 2004 Session

## WILLIAM ROSENBERG RICHARDS v. JOY WOOD RICHARDS

**Direct Appeal from the Circuit Court for Davidson County**
**No. 88D-1396     Muriel Robinson, Judge**

---

**No. M2003-02449-COA-R3-CV - Filed February 17, 2005**

---

This appeal involves a post-divorce petition for a reduction or termination of alimony.  Following a bench trial, the trial court ordered petitioner to continue paying $1,000 per month in alimony *in futuro* to Wife and granted Wife's request for her attorney's fees and court costs.  Wife's counter-petition for an increase in alimony was denied.  Both parties appeal.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

Robert A. Anderson, Nashville, Tennessee, for the appellant, William Rosenberg Richards.

Helen Sfikas Rogers and Robin K. Barry, for the appellee, Joy Wood Richards.

**OPINION**

*Factual Background and Procedural History*

This case marks the second appearance of these parties in this Court.  Following a thirty-four year marriage, William Rosenberg Richards ("Husband") and Joy Wood Richards ("Wife") were divorced on December 12, 1989.  Upon Wife's appeal from the divorce decree, this Court, in an opinion authored by Judge Koch, modified Husband's periodic alimony obligation by ordering him to pay to Wife $1,250.00 per month until March 1, 1992 and $1,000.00 per month thereafter.  *See Richards v. Richards*, No. 01-A-01-9005-CV-00164, 1991 WL 66443, at *1, 5 (Tenn. Ct. App. May 1, 1991)(*no perm. app. filed*)("*Richards I*").  In *Richards I*, we further modified the divorce decree by determining that Husband's support obligation should not terminate automatically upon his retirement or disability, but, rather, "the burden of demonstrating his inability to pay should more appropriately be on [Husband] if or when either of these events occur."  *Id*.  On March 21, 2001, Husband filed a petition for a reduction or termination of his alimony obligation, alleging a

substantial and material change in circumstances for both parties. Wife answered and filed a counter-petition for an increase in support. Following a bench trial, both petitions were denied. The parties now seek review by this Court of the trial court's order denying their respective petitions to modify alimony.

Because we have previously provided the factual background between these parties in *Richards I*, we will adopt and restate the relevant portions as follows:

> William Rosenberg Richards and Joy Wood Richards were married in January, 1955. Mr. Richards worked for a radio station. Mrs. Richards worked as an office manager for a public utility company but stopped working in 1961 when the parties adopted their first child. The Richards adopted a second child in 1963 and had a child of their own in 1967. Mr. Richards went to work in the Public Media Division of the United Methodist Church in 1966. After living in New York for several years, the Richards moved to Nashville in 1970.
>
> . . . .
>
> Mr. Richards filed for divorce in April, 1988. Mrs. Richards . . . counterclaimed for divorce, alleging irreconcilable differences, cruel and inhuman treatment, and adultery.
>
> Mrs. Richards moved to Florida in July, 1989 after accepting a job with a drug rehabilitation facility similar to the one where she had been working. In September, 1989, Mr. Richards moved in with his girl friend, the woman who had played a role in the parties' separation in July, 1987. Two of the parties' children continued to live in the house.
>
> Following a one-day trial, the trial court declared the parties to be divorced and apportioned the marital property and debts basically following Mr. Richards' recommendations. The trial court directed the parties to obtain a line of credit using the equity in their house as security to pay the expenses related to the upkeep of the house until its sale and to repay most of their outstanding joint accounts. The trial court also directed Mr. Richards to pay Mrs. Richards $750 per month in spousal support and to pay a portion of her legal expenses.

*Richards*, 1991 WL 66443, at *1–2 (internal footnotes omitted). After addressing Wife's issue with the trial court's division of the marital debt, we turned to the issue of spousal support:

> Mrs. Richards next takes issue with the amount and duration of the award for spousal support. . . .

Mr. Richards is now slightly more than sixty years old. He has a college degree and has worked for the same employer for twenty-five years. He currently earns more than $50,400 a year and has amassed sizeable pension benefits which will become more valuable the longer he works.

Mrs. Richards is nearing fifty-nine years of age. She has a high school degree and has taken some college courses. She worked in a succession of office jobs during twenty-two years of the marriage, but five years ago, she began a new career as a counselor in a rehabilitation facility. She began working for a new employer in 1989 and earns approximately $20,000 a year. She has no significant retirement benefits and has little prospect of increasing her earnings without obtaining a college degree.

As a result of the trial court's division of the marital estate, Mrs. Richards will receive between $57,000 and $58,500, depending upon the proceeds realized from the sale of the parties' house. Approximately $54,000 of this property is liquid. She will also receive an additional $300 per month after Mr. Richards retires, but these payments will end when Mr. Richards dies.

Mrs. Richards presently earns $1,666 a month, and her net monthly take-home pay is $1,366. She testified that her total monthly expenses amount to $2,638, including (1) a $304 monthly car payment that would cease sometime in 1990, (2) $100 for savings, (3) $135 for donations to her church, and $175 for travel, gifts, entertainment, and miscellaneous expenses.

The trial court determined that Mr. Richards should be required to pay Mrs. Richards $750 per month in spousal support but also determined that the [h]usband's alimony obligations shall cease upon one of the following events: (1) Wife's death or remarriage; (2) Husband's retirement; or (3) Husband becomes physically or mentally incapable of working.

The trial court also determined that the amount of Mrs. Richards' spousal support should be increased on January 1, 1991 by the percentage change in the consumer price index during 1990 and that Mrs. Richards could seek relief if, for any reason, she did not receive the $300 monthly payments from Mr. Richards' retirement benefits.

*Id.* at *4 (internal footnotes omitted).

In support of our award increasing Husband's alimony obligation, we stated as follows:

The Richards' marriage lasted for over thirty-four years. Mrs. Richards made significant monetary and non-monetary contributions and sacrificed her own education and employment to further Mr. Richards' career. Now, at the age of

fifty-nine, she is only a few years away from the normal retirement age. However, she has little accrued retirement benefits and limited savings. She will be required to support herself for the rest of her life using the funds awarded to her in this proceeding and whatever she will be able to earn. Her ability to increase her income above her present salary is limited by her age, her sex, and her lack of a college degree.

After reviewing the evidence in light of the factors in Tenn. Code Ann. § 36-5-101(d), we have determined that Mrs. Richards in entitled to more than temporary, rehabilitative support and that Mr. Richards should be required to pay her $1,250 per month until March 1, 1992 and $1,000 per month thereafter. We have also determined that Mr. Richards' obligation to support Mrs. Richards should not terminate automatically upon Mr. Richards' retirement or disability. While either of these occurrences could very well affect Mr. Richard's ability to pay support, the burden of demonstrating his inability to pay should more appropriately be on Mr. Richards if or when either of these events occur.

*Id.* at *5.

On April 7, 1990, less than four months following the parties' divorce in 1989, Husband married his paramour, Marion Richards. From the time of their marriage until approximately 1998, they lived together in a home owned by Marion Richards and her mother ("Netherlands Drive home"). During those years, Husband made the monthly mortgage payments of approximately $350 on the Netherlands Drive home. Marion Richards testified that, due to health problems, she stopped working full-time in "approximately 1992," but Husband testified that she had been "for the most part" continuously unemployed since 1990.

In 1995, Husband inherited approximately $222,000. On the advice of his stock broker, he invested the funds in "margin" accounts and initially profited. By 1998, however, the investment plan failed and Husband lost the entire inheritance.

Since long before the parties' divorce in 1989 and continuing until 1997, Husband was continuously employed as Director of Radio Ministry for United Methodist Communications ("UMC"). Beginning January 1, 1997, however, UMC's administration decided to "phase out" Husband's position. At that time, Husband was sixty-five (65) years old. Husband then elected to work under a series of one-year contracts with UMC, earning in the range of $14,000 to $15,000 annually. Eventually, the contracts were only renewed for roughly half the salary, and, by letter dated October 7, 2002, Husband was informed that support of his service was formally discontinued. Upon full retirement, Husband declined UMC's pension plan, which guaranteed a lifetime monthly payment of $1,700. Instead, Husband chose to receive his retirement benefits in a lump sum, which he invested in a variable annuity account, initially valued at $255,880.00. Since his retirement, in order to meet his obligations, Husband has increased his monthly annuity withdrawal from approximately $1,900 per month to $2,500 per month. At the time of trial, his annuity account was

valued between approximately $104,000 and $107,000. His only other sources of income include his social security retirement benefit of $1,539 per month and Marion Richards' social security draw of $534 per month. Thus, Husband claims a net monthly income of $4,573 per month.

In 1998, after UMC began "phasing out" Husband's full-time position, he and Marion Richards purchased a much larger home ("Sycamore Drive home"). The Sycamore Drive home was twenty-seven hundred (2,700) square feet and was located on two (2) acres in Wilson County. Husband testified that he did not contribute to the down payment and that the $74,000 down payment on the Sycamore Drive home came completely from Marion Richards' equity interest in the Netherlands Drive home.[1] Husband testified that he and Marion Richards decided to purchase the Sycamore Drive home primarily because Marion elected to receive early Social Security retirement benefits, and his personal contribution to the monthly mortgage payment would be comparable to what he had been paying on the Netherlands Drive home. Additionally, Husband contends that the Netherlands Drive home was poorly built, needed many repairs, and was less cost-efficient to maintain than the Sycamore Drive home. At some point after the purchase of the Sycamore Drive home, Husband took out a second mortgage "primarily to purchase a car." After refinancing, the monthly mortgage payment on the Sycamore Drive home was $1,107,[2] an amount that included principal, taxes, and insurance. At trial, Husband testified that he believed the Sycamore Drive home was worth between $200,000 and $210,000.

In 1994, Wife moved back to Tennessee and soon thereafter took a position as a case manager for Cumberland Heights, a drug rehabilitation facility. During her time at Cumberland Heights, Wife excelled and was eventually promoted to the position of Intensive Outpatient Family Coordinator, earning a gross income of approximately $35,000 annually at the time of trial. In 1995, after returning to Tennessee, Wife purchased a condominium for approximately $65,000. Wife testified that she made a $13,000 down payment on the condominium with funds that she received in the divorce as her marital share of Husband's then-accrued pension. Wife sold the condominium in 1999 for $91,000. She then purchased her current residence, at age 68, for $154,000, financing roughly $123,000 of that amount. After refinancing the mortgage in 2003, Wife's monthly mortgage payment was $1,182.

In June of 2002, Wife was diagnosed with malignant Stage IV lymphocytic lymphoma,[3] for which she underwent chemotherapy. In 2003, she retired completely at the age of 71. In her income

---

[1] Although Husband contends that Marion Richards provided the entire down payment, we note he and Marion Richards both testified that Husband had been making the monthly mortgage payment on the Netherlands Home since he began living there sometime in 1990.

[2] During the discovery stages of this matter, Husband responded that his monthly expenses included first and second mortgage payments totaling $1,725.38.

[3] In his deposition testimony, Wife's physician stated that lymphoma is a cancer of the lymph tissue of the body. He further explained that Stage IV represents the most elevated stage of the cancer and indicates the spread of the disease beyond the abdomen and chest regions.

and expense statement filed at trial, Wife showed a net monthly income of $1,805 per month. This amount included $299.54, which represented a service annuity payment through Husband's employment with UMC that was awarded to her in the divorce; $1,034 per month in Social Security retirement benefits; and $1,000 in alimony. In addition to her other income, during 2003 Wife was receiving monthly disability insurance benefits in the amount of $1,793.40. These disability payments benefits, however, were scheduled to terminate in March of 2004.[4] With regard to Wife's other assets, Wife testified that she has approximately $60,000 in equity in her home; $17,500 in profit sharing; $12,500 in checking and savings accounts; and approximately $77,500 in investments.

The current litigation began on March 29, 2001 when Husband filed his Petition to Decrease Support. In support of his petition, Husband alleged, in relevant part, the following:

5.      William Richards' position with his employer was "phased out" effective January 1, 1997.

6.      Since that time, not including "income" by the liquidation of assets divided by the Courts (including retirement monies), Mr. Richards has had income from all sources as follows:

(a)      1996    $82,608, including a capital gain of $12,194[;]

(b)      1997    $93,817, including $22,428 in capital gains and $13,876 in IRA distributions ($195 in social security benefits were excludable from gross income)[;]

(c)      1998    $76,743, including $44,639 in IRA distribution ($5,292 in social security benefits were excludable from gross income)[;]

(d)      1999    $49,314, including $25,667 in IRA distributions ($19,582 in social security benefits were excludable from gross income)[;]

(e)      2000 $67,053, including $29,887 in IRA distributions and an allowable capital loss of $3,000 ($19,649 in social security benefits were excludable from gross income).

---

[4]Wife testified that, at her age, she could not receive long term disability benefits for periods of longer than one year. She began receiving disability benefits in March of 2003. Although her benefits should have terminated in March of 2004, she opted to receive a lump sum advance payment of those benefits during 2003, before the conclusion of trial.

7. Of the social security benefits listed on William Richards' tax returns for 1998, 1999, and 2000, $4,248 was social security for his current wife, Marion, in 1998, $6,444 was social security for her in 1999, and $6,612 was social security for her in 2000.

8. Thus, William Richards has been depleting his assets by taking IRA distributions and even with these distributions has had a substantial and material drop in income.

9. On information and belief, the Respondent, Joy Wood Richards, has had material increases in income and has considerable retirement benefits accrued from the division of property in the Final Decree of Divorce allowing her to substantially improve her standard of living since the divorce through the present.

10. All the above constitutes a material change in circumstance, justifying a reduction and/or termination of the alimony obligation of the Petitioner.

In Wife's Amended Answer to Petition and Counter-Petition for an Increase in Support, filed September 30, 2002, she admitted that she had increased her income from the level it was at the time of the divorce. However, Wife denied that she was currently enjoying a better lifestyle than during the marriage. She further denied that she had accumulated considerable retirement benefits. In support of her counter-petition for an increase in support, Wife stated, in relevant part, the following:

2. Mrs. Richards would show that she is seventy (70) years old and has been working full-time in order to support herself despite struggling with ill-health from rheumatoid arthritis, lupus and fibromyalgia. Mr. Richards on the other hand has retired from full-time employment since January 1, 1997 and lives a very comfortable, if not excessive, retirement lifestyle with his new unemployed wife. Mrs. Richards would show that since the parties' divorce, Mr. Richards has had material increases in income and has accumulated a considerable amount of retirement benefits. Additionally, Mr. Richards also inherited approximately One Hundred and Twenty Thousand ($120,000) Dollars[5] from his mother when she died in 1995. Mrs. Richards would further show that since retirement, Mr. Richards supports his new wife, indulges in expensive vacations, bought a large five (5) bedroom home on a two acre lot, retains a housekeeper, and receives free health insurance through his previous employer, whom he continues to consult for. Mrs. Richards would also like to retire, but is unable to do so despite her health deteriorating.

[5]Although in her counter-petition Wife alleged that Husband had inherited $120,000, subsequent discovery and trial testimony indicate that he inherited $222,000.

3.      Mrs. Richards would also show that there has been a significant and material change in circumstances that justify an increase in Mr. Richard[s'] alimony obligations to Mrs. Richards. Mrs. Richards was recently diagnosed with lymphoma, a cancer of the blood, and requires chemotherapy treatments and will substantially shorten her life expectancy. Mrs. Richards has had to cut-back on the number of hours she works from 40 hours a week to an average of 25 hours a week because of her chemotherapy treatments, doctor visits and time needed for recuperation from the effects of chemotherapy. Her future health and ability to earn are completely in question and uncertain at this time. She would like an increase in alimony so that she does not have to continue working when she is ill and unable to do so.

A two-day trial was held on this matter on May 22, 2003 and August 28, 2003.[6] On September 9, 2003, the trial court entered its order denying Husband's petition and ordered him to continue to pay Wife $1,000 per month as alimony *in futuro*. Wife's counter-petition was denied without prejudice. Husband was further ordered to pay court costs and Wife's attorney's fees in the amount of $21,513. In denying Husband's petition, the trial court made the following findings from the bench:

This Court finds that Mr. Richards entered into the second marriage knowing his alimony obligation. He obligated himself to pay this additional support of this present wife voluntarily. This Court doesn't fault him for that, but he has to take care of the alimony obligation that the Court of Appeals remanded back down to this Court. He remarried knowing that the Court of Appeals had increased his alimony when he sought modification. He has sufficient assets to pay this alimony. It's not a significant award in the big picture of things here.

Mr. Richards totally controls his expenses and his expenditures. His retirement was foreseeable. His inheritance was foreseeable. He invested that. As it turned out, it was pretty much invested unwisely on these margin accounts which I've never known anybody really to do very good that has come into this courtroom on a margin account. But you're free to do that. You can blame your brokers or whatever. But he had the wherewithal to pay. I'm not penalizing him for losing his inheritance in these margin accounts, because even though that happened, he still has the assets to meet this alimony obligation. He took his lump sum retirement, and he has conserved that. That's a major asset that he still has.

. . . [H]is former wife is extremely ill. She has had disability income, which thank goodness she had that because she would have had to come back to this Court

[6]The three month recess during trial was due to the fact that Husband could not produce a copy of the financial statement used to obtain the refinancing loan for the Sycamore Drive home. The trial court recessed the hearing in order for Husband to obtain a copy of the financial statement.

before now for an increase in alimony, which this Court would have granted. Now it appears that her disability having taken the last payment in a lump sum is going to be discontinued in January. She may be back for an increase at that point in time. I don't know. But in any event, that is a major change of circumstance here that this Court has to note.

She has been a frugal person and a good manager of this alimony. She cannot be penalized, as Mr. Anderson would have her be penalized, for her awards that this Court made at the time of the divorce and the awards made to her by the Court of Appeals. She's conserved those, and it's a good thing. Because had she not conserved this estate and built it, Mr. Richards would be paying more alimony than what he is paying now. So she can't be penalized for that. She is seriously ill with this diagnosis of Lymphoma. She is in stage four. She's retired now. She is 71. She definitely needs this alimony payment, and Mr. Richards has the ability to pay.

. . . [H]is testimony was he's had an increase in his income. His income is around forty-three sixty-six. He has the ability to pay. His requests to reduce are really trivial. I don't know why he brought this petition under these circumstances. His health concerns and his present wife's health concerns are minute compared to her health concerns.

So this petition is respectfully dismissed. . . .

Husband appeals from the trial court's order and presents, as we perceive them, the following issues for our review:

(1) Whether the trial court erred in denying Husband's petition to reduce or terminate his alimony obligation; and

(2) Whether the trial court erred in awarding attorney fees to Wife in the amount of $21,513.

In addition, Wife raises the following issues:

(1) Whether the trial court erred in denying Wife's petition for an increase in alimony;

(2) Whether the trial court erred by requiring Wife to pay one-half of the costs associated with Husband's deposition of Wife's oncologist, Dr. F. Anthony Greco; and

(3) Whether Wife should be awarded her attorney's fees on appeal.

-9-

### Standard of Review

In general, we review the trial court's findings of fact *de novo* upon the record accompanied by a presumption of correctness as to those findings. Tenn. R. App. P. 13(d) (2004). Unless the evidence in the record preponderates against those factual findings, we must affirm, absent error of law. *Freeman v. Freeman*, 147 S.W.3d 234, 238 (Tenn. Ct. App. 2003). In cases involving modification of spousal support, the trial court's determination is "factually driven and calls for a careful balancing of numerous factors." *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001) (quoting *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989)). Therefore, the trial court is given broad discretion in its determination of whether the petitioner has met his or her burden of showing a "substantial and material change of circumstances," such as to warrant a modification of alimony. *See id*. (citing *Sannella v. Sannella*, 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999); quoting *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999)). As a result, appellate courts are generally reluctant to reverse a trial court's spousal support decision unless it amounts to a clear abuse of discretion. *See id*. (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)); *see also Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999).

### Husband's Petition to Decrease or Terminate Alimony

Husband's primary argument is that he should be entitled to a reduction in his alimony obligation because, since his retirement, he "has been significantly diminishing his assets and will soon have nothing without relief." Wife, on the other hand, contends that Husband's difficulties are the product of voluntarily obligations he undertook since the parties' divorce. Both parties have made several arguments related to their primary contentions, and we will address each in turn.

The beginning point for any case involving the modification of an alimony obligation is section 36-5-101(a)(1) of the Tennessee Code. Tenn. Code Ann. § 36-5-101(a)(1) (Supp. 2004). Section 36-5-101(a)(1)(A) provides that a court may decree an increase or decrease of an allowance for spousal support "only upon a showing of a substantial and material change of circumstances." *Id*. Generally, the burden of showing a substantial and material change in circumstances lies with the petitioner seeking relief. *Freeman v. Freeman*, 147 S.W.3d 234, 239 (Tenn. Ct. App. 2003). In *Bogan v. Bogan*, 60 S.W.3d 721 (Tenn. 2001), the Tennessee Supreme Court held that "when an obligor's retirement is objectively reasonable, it does constitute a substantial and material change in circumstances - - irrespective of whether the retirement was foreseeable or voluntary - - so as to permit modification of the support obligation." *Id*. at 729. In making a determination of whether the retirement was "objectively reasonable," the trial court should "examine the totality of the circumstances surrounding the retirement." *Id*. However, in no event will a retirement be found objectively reasonable if it is taken in bad faith for the purpose of defeating a support obligation. *Id*. at 729, 734. Therefore, "an obligor cannot merely utter the word 'retirement' and expect an automatic finding of a substantial and material change in circumstances." *Id*. at 729. Instead, the party seeking modification bears the burden of establishing the reasonableness of the retirement, and the trial court's determination as to such showing will not be disturbed absent an abuse of discretion. *Id*.

We should first note that, although Husband retired from full-time employment in 1997 at the age of sixty-five, he continued to work in some capacity with UMC until at least 2001. At the time Husband filed his petition to modify in March of 2001, he was approaching seventy (70) years of age. In issuing its ruling from the bench, the trial court in this case made no findings as to the reasonableness of Husband's retirement. The only finding that the trial court made with regard to Husband's retirement was that it was "foreseeable." Under *Bogan*, the foreseeability of a retirement is no longer a relevant consideration when making a determination of whether there has been a substantial and material change in circumstances. *Id.* Instead, the proper inquiry is into the reasonableness of the retirement based on the totality of the circumstances. *Id.* Based upon the record before us, it appears that Husband's retirement in this case was objectively reasonable. There is sufficient evidence in the record to support his contention that he was "forced" to retire. Further, he is now in his early seventies facing health problems related to his knees and eyesight. Moreover, Wife concedes in her trial testimony and in her brief to this Court that Husband's retirement was not secured in an effort to reduce his alimony obligation. Thus, we conclude that Husband's retirement was objectively reasonable.

In *Bogan*, however, the supreme court instructed that the modification decision does not end with a determination of whether a retirement was objectively reasonable. Rather, the *Bogan* court explained that

> even when an obligor is able to establish that a retirement is objectively reasonable, and therefore that it constitutes a substantial and material change in circumstances, the obligor is not necessarily entitled to an automatic reduction or termination of his or her support obligations. As evidenced by its permissive language, the statute permitting modification of support awards contemplates that a trial court has no duty to reduce or terminate an award merely because it finds a substantial and material change in circumstances. *See* Tenn. Code Ann. § 36-5-101(d)(2). Instead, the change in conditions resulting from retirement merely allows the obligor to demonstrate that reduction or termination of the award is appropriate. Accordingly, when assessing the appropriate amount of modification, if any, in the obligor's support payments, the trial court should consider the factors contained in Tennessee Code Annotated section 36-5-101(d)(1) to the extent that they may be relevant to the inquiry.

*Bogan v. Bogan*, 60 S.W.3d 721, 730 (Tenn. 2001)(citations omitted). Although section 36-5-101(d) provides several factors for consideration, it is well established that the two paramount considerations in spousal support cases are (1) the financial ability of the obligor to meet the alimony obligation, and (2) the financial need of the party receiving the support. *Id.* The *Bogan* court also clarified that, when deciding whether to *modify* alimony, as opposed to addressing an *initial* award, the obligor's ability to pay must be given equal weight as the recipient spouse's need for support. *Id.*

Turning to the facts of this case, Husband bore the burden of first demonstrating a material and substantial change in circumstances followed by a showing that a modification in alimony was

appropriate. Although Husband's retirement was certainly a change in circumstances, it was not the only change in circumstances that occurred since the opinion in *Richards I*. It cannot be overlooked that Husband chose to marry Marion Richards within a few months following the parties' 1989 divorce. In so doing, he effectively undertook the complete support of a new wife who brought little to no income to the marriage. In addition, in 1998, after admittedly knowing that his employment with UMC was being "phased out," Husband purchased a newer, much larger home for Marion Richards and himself. In purchasing this residence, he undertook a dramatic increase in his monthly mortgage payment, along with the associated increases in utility costs and property taxes that accompany such a "step-up."

The settled rule in Tennessee is that "obligations voluntarily assumed are not proper to be considered as changed circumstance[s] to reduce support payments otherwise owed." *Dillow v. Dillow*, 575 S.W.2d 289, 291 (Tenn. Ct. App. 1978); *see also Jones v. Jones*, 784 S.W.2d 349, 353 (Tenn. Ct. App. 1989). The trial court found that Husband "totally controls his expenses and expenditures," has conserved his retirement, and has sufficient assets to pay his alimony obligation. Husband asserts, however, that his stated income is artificially high because he has had to withdraw $2,500 per month from his retirement account in order to meet his support obligation. Although Husband claims that he has had to deplete his retirement account at an accelerated rate due to his alimony obligation, it is just as evident from the record that it is the additional expenses associated with the complete support of Marion Richards and the Sycamore Drive home that have left him in this position. We recognize, however, that Wife currently pays a monthly mortgage payment of $1,182 per month. Therefore, even dismissing that both parties have voluntarily incurred increased mortgage indebtedness, the record still reflects that Husband has undertaken the complete support of another spouse.

Husband relies on *Bowman v. Bowman*, 836 S.W.2d 563 (Tenn. Ct. App. 1991) for the proposition that he should be entitled to a reduction based upon the fact that he is having to liquidate a fixed resource in order to pay his alimony. In *Bowman*, we concluded that where the husband-obligor was unable to work and was forced to liquidate all of his assets in order to pay spousal support, such that he would soon have nothing from which to support himself, the support obligation should terminate within one year. *Id.* at 568–69. *Bowman*, however, is distinguishable for two reasons. First, the recipient-spouse in *Bowman* was to receive a 220 plus acre tract of land, which the court believed would be sold in order to provide for her support. *Id.* at 569. Additionally, there is no indication in *Bowman* that the obligor spouse had voluntarily undertaken the support of a new wife. Therefore, we are unpersuaded that *Bowman* is controlling in this case.

Next, Husband argues that Wife has experienced a substantial and material change in circumstances since the divorce and continuing until the time of her retirement that warranted a reduction in Husband's alimony obligation. It is true that Wife experienced an increase in her gross income from approximately $20,000 per year at the time of *Richards I* to approximately $35,000 per year at the time of the hearing in the present action. However, an increase in an alimony recipient's income by itself is not sufficient to warrant a downward modification. *Threadgill v. Threadgill*, 740 S.W.2d 419 (Tenn. Ct. App. 1987). Rather, a modification premised on an increase in the support

recipient's income is only proper where the support order was based on a presumption that the recipient would not continue to increase his or her income through the pursuit of his or her career. *Wright v. Quillen*, 83 S.W.3d 768, 774 (Tenn. Ct. App. 2002); *McCarty v. McCarty*, 863 S.W.2d 716, 720 (Tenn. Ct. App. 1992). In *Richards I*, we stated the following with regard to Wife's future earning potential:

> She . . . has little prospect of increasing her earnings without obtaining a college degree.
>
> . . . .
>
> . . . . She will be required to support herself for the rest of her life using the funds awarded to her in this proceeding and whatever she will be able to earn. Her ability to increase her income above her present salary is limited by her age, her sex, and her lack of a college degree.

*Richards v. Richards*, No. 01-A-01-9005-CV00164, 1991 WL 66443, at *4–5 (Tenn. Ct. App. 1991)(*no perm. app. filed)*. We believe the language in *Richards I* indicates that this Court contemplated that Wife would be able to increase her income to some degree, but that her earning potential was "limited." Regardless, by the time of trial, Wife was no longer employed due to her advancing age and complications associated with her lymphoma treatment. Therefore, her increased income was no longer a relevant consideration.

Despite Wife's retirement, Husband essentially asserts that he should be entitled to a reduction because Wife has managed to conserve her assets, including her alimony, retirement savings, and other income. However, the record reflects that the bulk of Wife's investments is the product of her conservation of assets awarded to her in the divorce as her division of the parties' marital property, such as a one-half division of Husband's then-accumulated pension in the amount of approximately $35,000. "Any income produced [from assets] awarded to a spouse in the division of marital property should not be a factor in determining whether or not a change of circumstances existed to warrant a modification of periodic alimony payments." *Norvell v. Norvell*, 805 S.W.2d 772, 775 (Tenn. Ct. App. 1990). Therefore, we are of the opinion that Wife's frugality should not be held against her.

Finally, Husband makes the curious argument that he should be given a credit against his support obligation in the amount of the social security retirement benefits to which Wife would have been entitled under Husband's earnings record. In this case, rather than electing to receive social security at the rate of fifty percent (50%) of Husband's benefits as a long-term spouse, Wife chose to receive monthly social security benefits based on her own earnings record. Consequently, she received monthly social security benefits in the amount of $965 instead of the $765 monthly benefit she would have been entitled to had she elected to accept benefits based upon Husband's wages. Husband asks this Court to expand the holdings in *Orr v. Orr*, 871 S.W.2d 695, 696 (Tenn. Ct. App. 1993), *Manis v. Manis*, 49 S.W.3d 294, 304 (Tenn. Ct. App. 2001), and *Sherrell v. Sawyer*, No. 87-68-II Summer Equity, 1987 WL 12498, at *4 (Tenn. Ct. App. June 19, 1987)(*no perm. app. filed)*,

to allow for such a credit against his alimony obligation. *Orr* and *Sherrell* both involved a situation where the court allowed a credit against a child support obligation where social security disability benefits were paid to the custodial parent from the account of the disabled non-custodial parent. As such, those cases are clearly distinguishable and do not govern the facts in the present case. *Manis* makes only a passing reference to the fact that the trial court granted a credit to the payor spouse for social security benefits received by the recipient spouse where the payor spouse was obligated to reimburse the alimony recipient for her tax liability. *Manus*, 49 S.W.3d at 304. No other reference was made by the court to this credit, and there is no indication how it affected the court's holding. Thus, we conclude that these cases fail to support Husband's argument.

The trial court found that Husband had the financial ability to meet his alimony obligation. The record reflects that, at the time of the hearing, Husband maintained over $100,000 in his retirement account. This Court's order in *Richards I* established that Husband would have the burden of demonstrating his inability to meet his alimony obligation in the event of his retirement or disability. Although the possibility exists that Husband will return to the trial court in the future with a subsequent petition to modify, we cannot say that the evidence preponderates against the trial court's finding that he has the present ability to provide the spousal support ordered. We are not insensitive to the fact that divorced persons have a right to companionship, and we are not by this opinion endorsing a proposition that such persons should live alone or be penalized. However, where one ex-spouse has a support obligation to the other, the obligor spouse should undertake obligations and make certain decisions in light of his or her existing obligation.

### *Wife's Counter-Petition for an Increase in Alimony*

In support of her counter-petition, Wife cited her lymphoma diagnosis, retirement, and increased health-related expenses due to her need for supplementary insurance to cover certain prescription medications. The trial court found that Wife's diagnosis with lymphoma was a "major change in circumstance" and that her condition would probably worsen. Also, the court noted that she had acted frugally and managed to conserve her estate. Although the court denied Wife's counter-petition, it stated that it would probably be entertaining a subsequent petition for an increase in support.

"[A] showing of a terminal illness alone is not a sufficient change in circumstances as to entitle the plaintiff to an increase in alimony." *Ferguson v. Ferguson*, No. 87-305-II Summer Equity, 1988 WL 109158, at *3 (Tenn. Ct. App. Oct. 21, 1988)(*no perm. app. filed*). Instead, the petitioner must show increased need based on increased expenses. *Id*. Here, Wife's retirement brought about increased healthcare costs due to the need to obtain supplemental insurance coverage. However, as the trial court noted, she has managed to conserve her investments and accumulated upwards of $100,000 in savings and investments. Although her expenses may have increased, we believe Wife will be able to adequately offset those expenses with those savings and the continued receipt of alimony. Therefore, we affirm the trial court's denial of Wife's counter-petition for an increase in support.

### *Attorney's Fees*

At the close of the proceedings below, the trial court ordered Husband to pay Wife's attorney's fees in the amount of $21,513. Husband argues that the trial court's award of attorney fees was an abuse of discretion for three principle reasons. First, Husband contends that section 36-5-103(c) of the Tennessee Code provides no basis for an award of "expenses" as opposed to pure fees. Husband argues that, because Wife's counsel's Attorney Fee Affidavit set out $3,644.59 in expenses for items such as photocopies, postage, and parking charges, any award of attorney fees should exclude amounts representing these claimed expenses. Additionally, Husband asserts that, because Wife did not file a Motion for Discretionary Costs under Rule 54 of the Tennessee Rules of Civil Procedure, there was no alternative basis for the trial court to have awarded the claimed expenses. Next, Husband asserts that Wife should not be awarded any fees related to the prosecution of her unsuccessful counter-petition to increase alimony because section 35-6-103(c) only allows for recovery of fees when related to the defense or enforcement of a support order. Finally, Husband contends that the trial court failed to conduct any critical examination of the billing records submitted by Wife's counsel, and that, because Husband's petition was reasonable and based on the law, each party should bear his or her own legal expenses. Wife argues that section 36-5-103(c) had been construed to include both fees and expenses. Wife further contends that, because it was Husband's petition to modify that initiated this litigation and his litigious conduct that prolonged this "frivolous lawsuit," Husband should bear the increased costs.

Although, in the argument section of his brief, Husband repeatedly refers to subsection (a) of section 36-5-103, we believe it is clear he was referring to subsection (c), which addresses an award of attorney fees. Section 36-5-103(c) provides:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child , or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn. Code Ann. § 36-5-103(c) (2001).

In the recent case of *Evans v. Evans*, No. M2002-02947-COA-R3-CV, 2004 WL 1882586 (Tenn. Ct. App. Aug. 23, 2004)(*no perm. app. filed*), this Court addressed the distinction between attorney fees awarded under section 36-5-103(c) and other bases for the award of fees in alimony modification proceedings. *Id*. at *10–16. In *Evans*, we recognized that this Court had previously reached "contradictory conclusions" with regard to whether an alimony recipient who defends an action to modify alimony qualifies for attorney fees under section 36-5-103(c). *Id*. at *13–14. *Compare Duke v. Duke*, Nos. M2001-00080-COA-R3-CV, M2002-00026-COA-R3-CV, 2003 WL

113401 (Tenn. Ct. App. Jan. 14, 2003)(*no perm. app. filed*)(holding that a spouse who defends a petition to change an alimony or child support order is acting to "enforce" it) *with Billingsley v. Billingsley*, W1999-00338-COA-R3-CV, 2000 WL 33128642 (Tenn. Ct. App. Oct. 9, 2000)(*no perm. app. filed*)(concluding that alimony recipient, although successful in defending an action to modify, was neither a "plaintiff spouse" nor was seeking to "enforce" the decree, and, as such, there was no statutory basis for an award of attorney fees). The *Evans* court agreed with the approach taken in *Duke* and concluded that section "36-5-103(c) authorizes a court to award attorney's fees to an alimony recipient who is forced to defend an action to reduce or terminate alimony." *Evans*, 2004 WL 1882586, at * 13. However, the court tempered its holding by stating the following:

> However, even if we agreed with the interpretation in *Billingsley*, that would not preclude a former spouse who defends a modification action from an award of fees based on authority other than Tenn. Code Ann. § 36-5-103(c). Prior cases have not examined whether the enforcement statute, Tenn. Code Ann. § 36-5-103(c), by its language is properly applied to actions to modify, rather than enforce, a prior order. We think the language of the statute clearly answers the question negatively. The statute speaks in terms of a "plaintiff spouse" recovering from a "defendant spouse" fees incurred in "enforcing" a support order. Clearly, the statute refers to actions to compel compliance with existing orders to pay support. An action to modify upward or downward an existing support obligation is not included in that description. Thus, although we have relied on former holdings to affirm an award to a spouse who defends a support order, we think the better reasoning is that attorney's fees in modification actions are not governed by Tenn. Code Ann. § 36-5-103(c).

*Id*. at *14.

Although the *Evans* court concluded that section 36-5-103(c) does not by its terms provide a basis for attorney fees in a support modification petition, the Court recognized that there was ample authority authorizing such awards in numerous modification cases. *Id*. at 14–15; *see also Sanella v. Sanella*, 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999); *McCarty v. McCarty*, 863 S.W.2d 716, 722 (Tenn. Ct. App. 1992); *Elliot v. Elliot*, 825 S.W.2d 87, 92 (Tenn. Ct. App. 1991); *Threadgill v. Threadgill*, 740 S.W.2d 419, 426 (Tenn. Ct. App. 1987). The cases cited by the *Evans* court establish that courts have used a number of bases as authority for an award of attorney fees in an alimony modification setting. *Evans*, 2004 WL 1882586, at *14–15. In many cases, the court relies on traditional principles applied to attorney fees in divorce cases and makes no distinction between initial awards of alimony and subsequent modification actions. *Id*.; *see also Sanella*, 993 S.W.2d at 76; *Seal v. Seal*, 802 S.W.2d 617, 623–24 (Tenn. Ct. App. 1990). A post-divorce action for modification of an alimony order is merely a continuation of the original matter, and, under section 36-5-101(a)(1) of the Tennessee Code, that order remains in the control of the court that issued the original order. Tenn. Code Ann. § 36-5-101(a)(1) (2001); *Evans*, 2004 WL 1882586, at *15. Therefore, as the *Evans* court concluded, trial courts are authorized "to award fees in a modification proceeding on the same basis, and according to the same principles, as a fee award is made in the divorce proceeding and initial award [of alimony]." *Evans*, 2004 WL 1882586, at *15. Thus, in reviewing an award of attorney fees

in a divorce action, the trial court is given broad discretion and its decision will not be disturbed upon appeal unless the evidence preponderates otherwise. *Batson v. Batson*, 769 S.W.2d 849, 862 (Tenn. Ct. App. 1988).

Husband is correct in pointing out that section 36-5-103(c) does not expressly provide for the recovery of pure "expenses." However, as we noted above, there was more than one basis for the trial court's award, and, as there is no indication in the record that the trial court was applying section 36-5-103(c), we do not believe it is necessary to look to that section in this case. From our research, we can find no case awarding attorney fees in a modification setting that makes a distinction between "fees" and "expenses." Rather, the cases seem to overwhelmingly award fees *and* expenses, and we believe that logic dictates that expenses are included in the attorney's fee as part of the total cost associated with defending the action. *See Alexander v. Alexander*, 34 S.W.3d 456, 466 (Tenn. Ct. App. 2000) (awarding fees and expenses under section 36-5-103(c) in child support petition); *Koja v. Koja*, 42 S.W.3d 94, 100 (Tenn. Ct. App. 2000) (awarding plaintiff-wife one-half of her attorney's fees and expenses); *Elliot*, 825 S.W.2d at 92 (awarding fees and expenses); *McCarty*, 863 S.W.2d at 722 (reasoning that alimony recipient "should not have to pay the cost of defending her entitlement to alimony . . .").

Next, Husband asserts that the court should have made a critical analysis of the billing records submitted by Wife's counsel so as to determine, first, what charges represented actions taken with respect to Wife's counter-petition and, second, whether the fee requested was reasonable. We disagree. First, Husband's argument that the trial court must distinguish between the type of action being brought under section 36-5-103(c) when making its determination whether to allow attorney fees is not supported by any relevant authority. As we stated above, there is nothing in the record to show that the trial court was acting under that section, and, further, that section is inapplicable to petitions to *modify* alimony. Next, absent a request for a hearing by the party dissatisfied by the award, a trial court is not required to entertain proof as to the reasonableness of the amount of attorney's fee awarded. *Kahn v. Kahn*, 756 S.W.2d 685, 696–97 (Tenn. 1988) (citing *Wilson Mgmt. v. Star Distribs.*, 745 S.W.2d 870, 873 (Tenn. 1988); *see also Cain v. Cain*, No. W2003-00563-COA-R3-CV, 2004 WL 404489, at *2 (Tenn. Ct. App. Mar. 3, 2004) (*no perm. app. filed*). Rather, the trial court is capable of adjudging the value of the attorney's services by having overseen the proceedings below. *See Kahn*, 756 S.W.2d at 696–97. Upon review of the record, we cannot say that the trial court abused its discretion by awarding Wife her attorney's fees.

### *Order Requiring Parties to Split Cost of Deposition*

After Wife filed her counter-petition, Husband submitted interrogatories to Wife regarding the severity of her medical condition. Dissatisfied with the completeness of Wife's responses, Husband filed a motion to compel. The trial court entered an order denying Husband's motion and providing that Husband, "if he so desired could take further discovery of [Wife's treating physician] Dr. Greco at his expense." Husband took Dr. Greco's deposition, incurring costs of approximately $453. Prior to trial, after learning that Wife intended to introduce Dr. Greco's deposition as part of her case-in-chief, Husband filed a motion *in limine* that sought an order prohibiting Wife from

introducing any evidence from Dr. Greco's deposition or requiring her to share the costs associated with the taking of the deposition. After entertaining arguments from each parties' counsel, the trial court granted Husband's motion and ordered Wife to pay one-half (½) of the deposition expenses should she use the deposition at trial.

Wife argues that Rule 32.01(3)(D) of the Tennessee Rules of Civil Procedure entitles her to use the deposition of Dr. Greco despite the fact Husband procured the deposition. Wife contends that Rule 32 contains no requirement that the party procuring the deposition be reimbursed for any associated costs. Wife further argues that the rule does not contemplate reimbursement as a prerequisite to the admission of such deposition at trial. Husband, on the other hand, argues that the trial court's order denying his motion to compel and thus forcing him to depose Dr. Greco effectively put Husband in the position of paying for the testimony that Wife ultimately planned to present at trial. Thus, he argues that the trial court did not abuse its discretion in ordering Wife to share an equitable portion of the deposition costs.

Rule 32.01(3)(D) provides in pertinent part the following:

> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: . . . (D) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena or the witness is exempt from subpoena to trial under T.C.A. § 24-9-101. . . .

Tenn. R. Civ. P. 32.01(3)(D) (2004). Under section 24-9-101(6) of the Tennessee Code, a "practicing physician" deponent is exempt from subpoena to trial. Tenn. Code Ann. § 24-9-101(6) (2000). While Rule 32.01(3)(D) may allow the use of the deposition, trial judges have broad discretion over the discovery process as well as the introduction of evidence at trial. *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992); *Austin v. City of Memphis*, 684 S.W.2d 624, 634 (Tenn. Ct. App. 1984). In view of the circumstances, we cannot say that the trial court abused its discretion by conditioning the introduction of the deposition upon the sharing of the costs associated with taking the deposition.

### *Attorney Fees on Appeal*

Wife requests this Court to award her reasonable attorney's fees incurred in connection with this appeal. While it is true, as she asserts, that she would not have incurred those fees had Husband not chosen to appeal, we do not agree that Husband's request for modification and subsequent appeal were "trivial." Instead, we believe that Wife is capable of paying her attorney's fees on appeal. Accordingly, her request for her legal expenses incurred on appeal is respectfully denied.

### *Conclusion*

For the foregoing reasons, we affirm the judgment of the trial court in all respects. Costs of

this appeal are assessed equally to the Appellant William Rosenberg Richards and his surety and the Appellee Joy Wood Richards, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE